# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| FREIGHTCAR AMERICA, INC., a | ) | |
| Delaware corporation, | ) | |
|     Plaintiff, | ) | |
| | ) | |
|       v. | ) | |
| | ) | Case No. 6:21-cv-00027-NKM |
| DAVIS-FROST, INC., a Minnesota | ) | |
| corporation, | ) | |
|     Defendant. | ) | |

## PLAINTIFF FREIGHTCAR AMERICA, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Nancy Temple
Jeffrey Tone
Katten & Temple, LLP
209 S. LaSalle Street, Suite 950
Chicago, IL 60604
(312) 663-0800
ntemple@kattentemple.com
jtone@kattentemple.com

John P. Fishwick, Jr. (VSB #23285)
Carrol M. Ching (VSB #68031)
Daniel J. Martin (VSB #92387)
Fishwick & Associates, PLC
30 Franklin Road, Suite 700
Roanoke, VA 24011
(540) 643-9772
john.fishwick@fishwickandassociates.com
carrol.ching@fishwickandassociates.com
daniel.martin@fishwickandassociates.com

May 9, 2022

*Attorney for Plaintiffs*

This Court should deny the motion for summary judgment of Davis-Frost, Inc. ("D-F") because there are material issues of disputed facts and D-F is not entitled to judgment as a matter of law. D-F sets forth only selective facts, ignoring evidence that D-F's poor paint formulation caused a material breach of its contract with FreightCar America, Inc. ("FCA"). D-F's breach resulted in $3.5 million in costs to repair 300 railcars FCA manufactured in 2019 that were damaged by D-F's defective paint. Meyer 29:1-30:5. D-F ignores the admissions of its own chemist that D-F *knew* that its paint blistered and failed within the specifications D-F provided to its customers in its Product Data Sheet ("PDS"), but lied to FCA about the fact that D-F knew that its waterborne paint regularly blistered due to its poor formulation with too much solvent.

The record establishes that D-F misrepresented the qualities of its paint to FCA beginning in May 2019 and continuing throughout FCA's production of the 300 railcars from July 2019 to early November 2019. D-F's paint did not perform as D-F represented: rather, it blistered and bubbled immediately after FCA completed production and after FCA's customer Mitsui Rail Capital, LLC ("Mitsui") had inspected and accepted the 300 railcars. The record also establishes that FCA complied with D-F's recommended paint application standards but the paint nonetheless blistered. FCA promptly notified D-F when blistering appeared in November 2019 after FCA shipped most of the railcars from its Alabama plaint to Mitsui's Georgia storage facility. D-F responded by repeatedly misleading FCA about what D-F now admits it knew about its poor formulation that caused its paint to fail.

When D-F sold its paint to FCA, D-F advised in its PDS that the paint should be applied at a dry film thickness ("dft") of 4 mils minimum to 8 mils maximum per coat of paint to avoid blistering. FCA complied with the 4 to 8 mils per coat recommendation. But D-F *knew* that its representation was *false,* and as its chemist Darren Lowe wrote in December 2019, "our coatings

1

will blister" at "dry film build > 5 mils dft per single coat" and at "dry film build > 6 mils dft total." DF2518 (Ex. 1); *id.* at DF2517 ("All 3 [Water-Tuff colors] blister at 7+"). Also in November 2019, D-F secretly launched Blister Studies of its defective waterborne paint to determine why blisters were occurring with D-F's waterborne paint. D-F 30(b)(6) (Lowe) 12:25-13:19 (Ex. 2). The Blister Studies showed that water was being trapped in the D-F coating and other issues. D-F 30(b)(6) (Henning) 26:12-23, 28:25-29:5, 60:2-7, 65:1-66:11 (Ex. 3). D-F did not share these test results with FCA. *Id.* 66:12-14; D-F 30(b)(6) (Lowe) 12:16-24 (Ex. 2).

D-F had known for years that its paint blistered because it had too much solvent in the formula, as a federal court jury found in 2008 rendering a verdict against D-F in favor of railcar manufacturer Gunderson's. D-F 30(b)(6) (Henning) 30:12-17, 43:2-6; Henning 17:7-18:5, 26:5-8 (Ex. 4). D-F nonetheless recklessly used 21 different batch formulas for the mineral brown Water-Tuff paint, without any documentation or testing to support the various formulas. Daum 72:22-74:3, 79:20-80:23 (Ex. 5); D-F 30(b)(6) (Henning) 15:13-16:13, 22:2-25:4, 34:1-24, 39:17-40:18 (Ex. 3). D-F never disclosed these facts to FCA. *Id.* 16:15-17:9, 36:10-37:12; Henning 136:5-8; FCA 30(b)(6) 214:17-20 (Ex. 6). It was not until *after* FCA reported the Mitsui railcar blistering that D-F started testing the effect of solvents and plasticizers in its waterborne paint on the curing process. D-F 30(b)(6) (Lowe) 21:20-24. To this day, D-F has no explanation for why its paint blisters even when it is applied at less than 8 mils dft, within D-F's specifications. D-F 30(b)(6) (Henning) 27:3-19, 28:2-13.

D-F refused to cooperate with FCA in trying to determine the root cause of the paint failure, did not timely respond to FCA's warranty claim, and never offered to repair the damage caused by its failed paint, which cost FCA $3.5 million to repair. FCA is entitled to a trial on its breach of contract and fraud claims.

## **Facts**

1.     FCA designs and manufactures a variety of railcars and railcar components for transportation of commodities and containerized freight products in North America. Kelly Decl., ¶3; Ex. 7. FCA is headquartered in Chicago, Illinois, and has operated different railcar manufacturing facilities in the United States, including plants in Roanoke, Virginia (closed in 2019); Cherokee, Alabama ("Shoals") (closed in 2021); and Danville, Illinois (sold in 2018). *Id.* FCA has manufactured railcars for its own use and for sale or lease to others, and purchases materials in that process, including protective coatings from D-F and other paint suppliers to protect the steel railcars from corrosion. *Id.* ¶4; FCA 30(b)(6) 51;14-52:4.

2.     Mitsui Order. In 2019, FCA sold 300 railcars to Mitsui that were combined in units of three 53-foot railcars to form 100 well-cars. FCA 30(b)(6) 320:1-7. FCA manufactured the railcars from July 2019 to October 2019, and Mitsui certified its acceptance and paid the full price of $21.475 million. Kelly Decl., ¶3, Ex. 8; Andersen 24:24-31:13, 32:12-17 (Ex. 9). D-F sold its Water-Tuff Mineral Brown paint for FCA to use as a protective coating for these 300 railcars.

3.     FCA's Railcar Painting Expertise. FCA's Shoals facility was annually certified by the American Association of Railroads. FCA 30(b)(6) 28:4-30:1. FCA followed industry standards including the Standards of the Society for Protective Coatings, as documented in FCA's paint maps. *Id.* 40:19-41:16; Murray 68:23-69:1, 70:21-71:4 (Ex. 10); Rocha 404:10-21, 405:5-13, 413:18-24 (Ex. 11). FCA successfully manufactured over 10,000 railcars at the Shoals facility annually. FCA 30(b)(6) 128:3-16.

4.     FCA's blast and paint shop manager, Joel Rocha, had over 20 years of experience painting railcars at FCA and was very talented. FCA 30(b)(6) 136:1-12; Meyer 71:15-72:4 (Ex. 12); Rocha 389:1-8, 389:17-25. Rocha reported to production manager Paul Underwood, who had

overseen production at FCA for seven years and now manages a plant for Mercedes-Benz parts. Rocha 394:2-3; Underwood 4:11-5:14, 6:3-5, 8:1-10:3, 11:3-24 (Ex. 13). FCA's painters were trained and experienced and there were no new hires when production commenced in July 2019. Underwood 38:24-39:17. Paint team leader Chad Murray had substantial paint experience, including 13 years at the Shoals facility, and oversaw the paint team with Rocha, meeting daily and ensuring the work met specifications. Murray 9:19-22, 12:16-13:23, 19:6-20:6, 20:13-18, 20:19-21:15, 24:17-25:11, 26:1-12, 27:10-28:6, 28:13-29:1, 30:12-23; Rocha 404:10-21. Murray and Anna Pilkilton of FCA had taken paint classes sponsored by D-F and other paint manufacturers. Murray 11:11-16, 12:4-9; Ex. 46; FCA 30(b)(6) 43:14-25. Pilkilton had industrial coatings experience at FCA, Navistar and a water storage tank painting company. Pilkilton 8:8-9:15, 8:16-12:1, 20:16-21:11, 21:18-24:10 (Ex. 14).

5.    <u>FCA Complied with D-F's Recommendations</u>. FCA follows the paint manufacturers' recommendations for paint application. FCA 30(b)(6) 36:13-18, 39:21-25, 40:2-8; Murray 24:17-25:11, 30:12-23; 26:1-12, 31:20-25. Prior to the production of the 300 railcars,[1] FCA obtained D-F's recommended procedures to prepare and blast the steel, and to apply and dry the paint. FCA 30(b)(6) 59:1-25, 62:7-64:15; Rocha 408:12-22; Murray 31:20-25, 32:11-33:14. FCA required D-F to validate FCA's paint application at the beginning of the build. FCA 30(b)(6) 67:13-68:19.

6.    FCA painted test panels of blasted steel with D-F's mineral brown Water-Tuff paint, pursuant to D-F's specifications in the PDS (Ex. 15) and showed those panels to the D-F technical sales director Greg Carmichael. Murray 89:8-25, 91:10-92:19, 94:11-96:8. D-F specified

---

[1] The 300 railcars were combined into three-car units of A, B, and C cars into 100 well-cars. FCA 30(b)(6) 46:4-13. D-F's half-hearted suggestion in a footnote that this means that FCA's claim is limited to 100 railcars is without merit. There is no genuine dispute that 300 railcars are at issue, FCA purchased and used paint for 300, not 100, railcars, and that each of the 300 railcars suffered paint blistering defects.

a minimum of 4-5 mils dft to achieve the coating protection necessary for industrial railcars and for D-F's warranty. Ex. 15. Each "mil" (1/1000 of an inch) was measured using electronic gauges that FCA calibrated daily. Pilkilton 24:11-23, 25:6-26:14; Iezzi 126:17-24 (Ex. 16); Murray 62:20-24. To achieve the specified "4-5 mils minimum," the PDS recommended using 12-15 wet mils or 12-16 wet mils. Ex. 15, pp. 1, 2. D-F's PDS for its Water-Tuff paint represented that "Maximum wet film thickness per coat is 18-22 mils," Ex. 17, p. 3, which FCA relied upon. Murray 112:12-113:24. D-F, however, had never tested these representations. Crouch 23:22-26:2 (Ex. 18).

7.    When FCA applied 12-15 wet mils on the test panels, that application did *not* yield 4 mils dft and D-F's paint performance was *not* consistent with its PDS. D-F 30(b)(6) (Henning) 86:1-24; Rocha, 420:25-422:3; Murray 91:10-92:19, 93:2-94:6, 94:11-96:8; Pilkilton 60:19-61:6, 90:1-92:4. Rocha and Murray showed Carmichael the test panels, who advised FCA to apply 18-20 wet mils to achieve the 4 mils dft minimum. Murray 113:7-24, 115:15-116:20; Rocha, 420:25-422:3; D-F 30(b)(6) (Henning) 86:1-24. FCA relied on D-F's representations to apply 18 wet mils to achieve 4 mils minimum dft. Murray 113:7-24; Rocha 420:25-422:3. FCA applied 18 wet mils because 20 wet mils and above generated paint runs. Rocha 452:9-19. D-F approved the application of 18 wet mils and never told FCA that FCA was over-applying paint on the Mitsui railcars. Rocha 478:19-479:1.

8.    <u>Sample Car Inspection</u>. Prior to production, FCA prepared a sample well-car for inspection and approval by D-F and Mitsui. Carmichael "[i]nspected AOK sample car with Freightcar staff and collected 308 dft readings and had an average of 6.15 mils dft." Ex. 19. Carmichael noted "[a] few readings below 4 dft" and pointed them out to FCA for corrections. *Id.* D-F stated: "Overall the car looks good and we don't take any exceptions with the application of our paint." *Id.* D-F certified that D-F's paint "has been applied in accordance with our

recommended practices and is operating to our satisfaction. I give my approval of the application and workmanship for our company." *Id.*; FCA 30(b)(6) 204:19-206:12, 206:20-208:11. D-F certified that FCA had applied the paint in accordance with D-F's PDS. Carmichael 54:17-60:1 (Ex. 20); Henning 172:19-173:16; Rocha 494:8-495:2; Underwood 15:11-16:3.

9.      D-F approved the application of its paint on every FCA sample car it ever inspected. Henning 171:10-172:18; FCA 30(b)(6) 81:9-11, 81:22-24. Carmichael never told FCA that FCA was *over*-applying D-F paint. Murray 103:6-9, 114:5-25, 115:9-13; Rocha 478:19-479:1. Nor did Mitsui's inspector say that FCA was over-applying paint. Murray 103:10-15. Carmichael cannot identify any facts indicating that FCA ever misapplied D-F paint. Carmichael 37:6-38:9.

10.      Mitsui's vice president of operations, Robin Andersen, testified that Carmichael positively commented on FCA's paint application at the sample car inspection. Andersen 14:25-15:22 (Ex. 9). Carmichael reassured Andersen that the D-F paint had long-term durability and integrity to protect against corrosion and to limit environmental risk. *Id.* 22:6-24:23.

11.      FCA's Production. After the sample car inspection, FCA's full production of the 300 railcars commenced and the order went "extremely well." Underwood 16:24-17:13. Carmichael visited the Shoals plant every two to four weeks during production to inspect the paint process and did not identify any concerns. Underwood 17:14-18:12, 18:13-19:3; Henning 66:13-67:1; FCA 30(b)(6) 68:24-73:15; 423:4-423:5, 423:25-424:5; Rocha 492:9-494:7. Carmichael's predecessor, Dick Ivey, similarly had certified the quality of FCA's paint application at multiple sample car inspections (Ivey 14:2-23, 16:13-18, 21:7-26:5 (Ex. 21); Ex. 22), and had regularly visited and observed FCA's paint operations. Ivey 12:11-13:1.[2]

_____

[2] For example, Ivey took 150 dft readings on one inspected railcar that averaged 9.76 mils and concluded that the railcar looked good and approved that paint application. Ivey 24:20-28:24, 29:14-23; *see also id.* 30:1-33:7, 33:15-38:13, 40:17-21, 46:23-25, 47:7-52:3; Exs. 23-26.

12. As the railcars were prepped, blasted, painted and then dried, FCA continually monitored the process. The blast team measured the blast profile and documented the mils on paint maps for each railcar, evidencing compliance with D-F's specifications. FCA 30(b)(6) 36:19-37:6, 37:20-38:4; Murray 32:11-33:14; Rocha 414:15-416:15, 418:10-23. The railcars moved to Paint Booth 1 for painting, to a staging area for flash-off time of 30 minutes, to Paint Booth 2 for touch-ups, and to Hygrex drying booths for four hours. Murray 34:2-36:1; Rocha 449:20-451:11. The painters measured the wet film thickness as they applied paint. *Id.* 41:20-44:2. FCA complied with D-F's recommendations for airless spray paint application. *Id.* 96:9-97:9. Murray and Rocha observed the process, took wet film thickness measurements, and inspected the railcars. *Id.* 26:1-12, 27:10-28:6, 28:13-29:1, 41:20-44:2; Rocha 451:14-452:4, 490:5-14 (Rocha inspected 80% of the blast and paint work). They ensured that the environmental data of surface temperature and humidity were recorded on the paint maps and were within D-F's recommendations. Exs. 15, 27; Murray 81:10-82:2, 98:1-99:1, 100:21-101:22, 101:24-102:8; Rocha 454:6-20, 461:3-18, 462:20-463:8; Tonn 29:16-30:1 (Ex. 28).

13. After the painted railcars went through the drying booths, Pilkilton took dft readings using the same process on each railcar, documenting her findings on the paint maps and calculating average dfts. Pilkilton 24:11-23, 25:6-26:14, 52:20-61:6; Rocha 432:24-435:10. Carmichael did spot checks and reviewed paint maps, but never raised any issues with FCA's paint map data. Pilkilton 36:9-18; 111:18-112:17; Rocha 424:15-23, 425:25-427:13. If Pilkilton noted any dft readings below 4 mils or above 8 mils, or paint runs or visual issues, Pilkilton 112:18-114:9; Ex. 47, Pilkilton raised those matters with Murray, Rocha or FCA's quality inspectors and any issues were repaired and resolved. Murray 85:10-25; Pilkilton 66:19-67:17, 66:10-72:23, 74:1-75:25.

14. Murray reviewed paint maps and if any dft was above 8 mils, Murray reviewed to

confirm that those millages reflected two coats of paint where touch-ups had occurred.[3] Murray 49:4-18, 58:3-20, 58:22-29:8, 59:14-60:8, 75:18-76:18, 79:23-80:22. Any issues were resolved before the quality inspectors signed off on each railcar. FCA 30(b)(6) 44:5-16; 82:1.7-83:4; Murray 87:10-24. Mitsui's resident inspector, Marchio, did a final inspection and checked millages to ensure that the paint dft measured within the D-F specifications. Marchio 5:12-21, 8:16-9:13, 14:18-15:4, 15:5-16:21, 23:6-24:12, 24:23-37:24, 88:5-91:21, 118:2-122:11; Ex. 30. Mitsui accepted all 300 railcars as meeting the specifications and no blistering was observed. *Id.* 40:11-16; Ex. 30; Andersen 24:24-31:31; FCA 30(b)(6) 80:19-81:1. D-F has no facts indicating any problems with FCA's dft measurements on the paint maps. Henning 84:14-19.

15. <u>Mitsui Reports Blistering.</u> In early November 2019, MRC discovered that certain of its brand-new well-cars that it had shipped to Georgia showed blistering, orange peel and bubbling. As time passed, the railcars' condition deteriorated. Andersen 37:16-39:3.

16. <u>FCA's Response.</u> FCA promptly notified D-F and conducted a field inspection of the blistered cars with Mitsui and D-F in Georgia, noting the paint was very bubbly and had bad surface conditions. FCA 30(b)(6) 123:6-16, 120:22-121:16; Rocha 465:5-16. 469:5-471:7. FCA observed blistering at 4-6 mils. Rocha 465:5-16; FCA 30(b)(6) 255:5-6. FCA compared dft readings of blistered cars to paint map dft data, noting the data were different and that the paint had "expanded" and was absorbing water. Rocha 466:5-468:12; FCA 30(b)(6) 241:17-242:20. FCA undertook an 8D or eight disciplines analysis to determine the root cause of the paint failure,

---

[3] At times, certain areas around complex fittings of the railcar needed a second coat application because the initial application did not reach 4 mils, or other repairs resulted in a second coat application. Pilkilton 109:22-111:17; Rocha 427:21-428:11. These repaired areas resulted in a small percentage of dft readings that totaled 8-9 mil dft, but on a per-coat basis, each coat complied with the 4-8 mil dft specification. Pilkilton 66:19-67:17, 66:10-72:23, 74:1-75:25. Carmichael confirmed that the second coat to repair certain areas resulting in a total dft above 8 mils complied with D-F's specifications. Rocha 427:14-17, 437:8-11.

initially identifying all possible causes. Meyer 5:18-6:2, 10:22-11:11, 13:19-17:22. D-F did not fully cooperate. Meyer 25:12-22; Tonn 51:6-17. Contrary to D-F's mischaracterization, the 8D analysis in November 2019 was *not* a finding but merely an initial identification of all possible issues. Meyer 13:19-17:22; Tonn 121:10-122:9. After full investigation, FCA concluded that it had properly followed all of D-F's paint application recommendations with experienced and qualified personnel. Rocha 483:1-8, 485:14-20, 487:2-14, 489:4-490:1; FCA 30(b)(6) 260:1-22, 278:10-24, 282:17-283:21; Tonn 39:6-12, 39:19-24, 44:4-45:22, 122:14-20. 5:12-21, 8:16-9:13, 23:6-24:12, 24:23-29:6, 28:23-37:24; Ex. 30.

17.     D-F's Response. D-F's chemist Lowe admitted to FCA at a November 26, 2019 meeting in Shoals that the paint blistering "is *not* specific to over-application and agreed that the data proved there were other issues at play." Ex. 31 (emphasis added); Underwood 21:10-26:5, 26:12-27:8, 27:9-28:10, 28:11-29:7, 30:24-31:8; Lowe 65:26-71:15, 71:16-22 (Ex. 32). Lowe admitted that D-F had tried additives in its formula to avoid blistering, but that effort did *not* work, and D-F did *not* share these results with FCA. Lowe 60:2-61:18; Underwood 29:8-30:23. Although D-F's chemist knew that the paint failure was caused by D-F's poor paint formulation, curing the paint on the outside too quickly and trapping water inside, D-F did not disclose that information to FCA. Lowe 51:16-52:1, 59:15-19. Ex. 31. D-F embarked on a course to deflect responsibility by attempting to blame FCA for D-F's own paint failure, asserting without any basis, that FCA had over-applied the D-F paint. However, the data proved that blisters occurred below the specified 8 mil dft maximum. Underwood 31:18-33:1.

18.     D-F did not provide any information to FCA or Mitsui regarding the root cause or why D-F paint blistered in the 4-8 mil dft range. Andersen 39:4-12, 66:11-68:9. D-F made false reassurances to Mitsui in November 2019 that nothing was wrong with the D-F paint, but D-F

never disclosed that its waterborne paint had blistered when used by other manufacturers, Andersen 66:11-68:9. D-F refused to provide information to FCA regarding D-F's paint composition and formula, even though FCA had signed a nondisclosure agreement. D-F 30(b)(6) (Henning) 59:7-17; Henning 90:1-91:11, 102;22-104:21; Ex. 116. D-F knew that FCA relied on D-F's representations that its paint was fit for its intended purpose to provide a long-term protective coating. Henning 104:22-105:1.

19.    On March 31, 2020, FCA sent a written warranty claim to D-F. Henning 112:15-113:16. By May 2020, FCA notified D-F that FCA needed to repair the Mitsui railcars and gave D-F an opportunity to inspect the railcars. Ex. 33; Henning 118:20-120:18. D-F never offered to repair or pay any costs of repair. Henning 112:15-113:16; Meyer 72:5-10.

20.    <u>D-F's Concealment and Attempts to Shift Blame</u>. Contrary to FCA's transparent investigation into the root cause of the paint blistering, D-F concealed from FCA its lab test results showing blistering at greater than 5 mil dft and attempted to blame FCA, claiming FCA over-applied D-F paint. Meyer 72:11-14. D-F had a sophisticated lab and chemists and knew that FCA did not and relied on D-F's coatings expertise. Meyer 72:15-73:2; R. Love 41:19-42:4 (Ex. 34). D-F never disclosed to FCA that other customers had complained about blistering with D-F's waterborne paint. Meyer 73:3-18.

21.    D-F's attempts to blame FCA are unsupported by the evidence. First, the paint maps are the best contemporaneous evidence of the dft of the D-F paint at the time the railcars were painted and the vast majority of the dft readings recorded were within the 4-8 mils dft specification. Daum 127:12-129:2. D-F admitted that due to the practicalities of applying paint to a railcar, its 4-8 mils dft specification applies to the "majority" of the surface (Henning 146:6-21; Ex. 35, p. 2) and to an average of dft readings. Ex. 19; Ex. 36; Ivey 51:2-12.

22.     Second, the few areas on the paint maps where FCA recorded dft readings greater than 8 mils and less than 10 mils are within the D-F specifications because those areas reflected *two* coats of paint to achieve the minimum coverage. The D-F specification of 8 mils dft maximum is a *per coat* standard and D-F did not recommend any maximum. Henning 55:8-22, 56:18-57:4, 61:5-14; Lowe 84:9-85:20; Ex. 69; Carmichael 62:20-63:14, 64:24-65:16; D-F 30(b)(6) (Henning) 82:12-16; Lowe 40:11-13. D-F had also approved sample cars with an average dft reading of 9.76 mils. Carmichael 96:6-105:19; Ex. 37. D-F's written paint procedure directs that if an area shows low mil dft, the painter should touch up that area and apply a second coat. Ex. 27; D-F 30(b)(6) (Lowe) 111:25-112:20.

23.     Third, blistering occurred *even when the dft readings were less than 8 mils.* FCA asked D-F why blistering was occurring at 6 mils dft after the inspection in Georgia, but D-F never responded. Ex. 38; Henning 58:7-59:23; Carmichael 108:9-109:25. D-F's chemist testified "I don't have a good answer" when asked whether D-F did anything to determine why blistering occurred at 6 mils dft within specifications. Lowe 144:21-145:4. Carmichael admitted that blistered areas had dft readings less than 5.5 mils. Carmichael 129:14-130:1. FCA's expert confirmed that bubbling was observed where dft was 4-8 mils. Daum 60:14-25.

24.     <u>Measurements of Blistered Areas Are Inaccurate</u>. D-F's claims of over-application of paint are based on dft readings taken of blistered areas *after* blistering appeared, as Carmichael and Lowe admitted. Carmichael 39:7-15; Lowe 37:14-40:7. D-F also relies on Bane's testimony that he saw "over-application," but Bane admitted the sole basis for that testimony was measurement of blistered areas on railcars. Bane 74:10-16.

25.     FCA and its experts Dr. Iezzi and Daum explained that any dft readings taken after blistering or bubbling of the paint occurs are not reliable or accurate: "the field data is suspect

because it's also measuring that foaming and the addition of the vapor pockets" in the paint. Daum 68:15-20; FCA 30(b)(6) 147:8-17; Pilkilton 106:6-12, 107:11-19; FCA 30(b)(6) 267:1-7. The bubbles or honeycombing observed in the D-F paint interfered with the electronic gauge and resulted in faulty dft readings. Daum 94:2-95:3, 99:1-16, 100:1-6; FCA 30(b)(6) 241:17-242:20. Don Love, D-F's paint sales contractor, agreed that measuring millage of blistered areas is unreliable. D. Love, 19:15-25 (Ex. 39). Dr. Iezzi confirmed with the gauge manufacturer that dft measurements where blisters exist yield dft readings that are not accurate because the gauge is measuring the void underneath the blister. Iezzi 21:25-22:18.

26.　　<u>FCA's Roanoke Facility Process was Different</u>. The painting process at the Roanoke facility was different from the process at the Shoals facility and D-F ignores those difference in comparing the experiences of those facilities using D-F's mineral brown paint. Daum, who spoke with the former Roanoke manager Bane and former Shoals manager Murray (Daum 32:24-34:25, 35:6-20), explained that at Roanoke, FCA applied a thin tack layer with a short flash time, and then applied a top coat. Daum 76:14-77:3; Bane 33:4-8, 34: 5-10, 53:21-54:11 (Ex. 40). Shoals applied one coat of paint, with two coats used only for partial repair areas. Roanoke cured the paint using a gas oven that heated to 150 degrees Fahrenheit. Bane 53:14-20. At Shoals, the flash time was 30 minutes, and the Hygrex booths were not heated ovens but rather dehumidifiers, with temperatures from 85 to 95 degrees Fahrenheit. Underwood 35:20-36:24, 36:25-38:3, 39:18-45:15; FCA 30(b)(6) 79:7-80:2; Rocha 448:18-449:11. During production, FCA checked the temperatures in the Hygrex booths. Murray 81:10-82:2, 82:21-83:12. These different processes and different equipment were both acceptable practices, Daum 36:5-12, but resulted in different performance of the same D-F mineral brown paint. Daum 77:4-8.

27.　　<u>FCA's Hygrex Did Not Cause Blistering</u>. D-F was very familiar with the FCA

Hygrex dehydration system when it sold paint to FCA, but never raised any issues concerning the Hygrex booths. FCA 30(b)(6) 208:12-209:5, 209:17-210:5, 210:25-211:22; Rocha 495:3-8, 498:11-20. Carmichael now claims he has no knowledge about FCA's Hygrex system. Carmichael 49:8-11. D-F's December 2019 TTX Preventative Plan to prevent blistering did not even mention the Hygrex dehydrators. Carmichael 119:13-123:17 (Ex. 35). D-F inconsistently told FCA that no heat created the worst-case scenario for blisters to occur and then attempted to blame "hot air" from the Hygrex system for causing blistering. D-F 30(b)(6) (Lowe) 38:6-39:7. FCA's expert opined that FCA's Hygrex dehydrator system did not cause the blistering. Daum 60:25-64:6.

28.    FCA's Repairs Were Reasonable. FCA asked D-F for recommendations regarding a repair process, but D-F never provided any. Henning 109:12-110:21; Lowe 91:8-92:8; Carmichael 94:23-95:6; Andersen 39:4-12. Lowe admitted that D-F conducted no testing to support any repair plan. D-F 30(b)(6) (Lowe) 53:13-16. In December 2019, FCA retained independent industrial coating expert Robert Iezzi, Ph.D., to advise regarding the root cause of the paint blistering and assist with determining reasonable repairs. Iezzi 12:17-20, 13:2-15, 70:1-24; Meyer 24:13-25:11. FCA explored repair options, attempting to avoid the cost and time to repair by complete removal of the D-F paint. Andersen 40:22-42:1; Meyer 37:3-39:5; Tonn 58:3-11.

29.    The test results, however, did not support the partial repair proposals to meet long-term protective coating needs. Meyer 41:14-24; Andersen 73:23-74:3, 94:18-19, 97:7-17; Tonn 58:22-59:9, 61:10-62:4. After testing different partial repair methods, Dr. Iezzi and FCA concluded that the only way to repair the damaged railcars was to remove entirely the D-F paint and repaint the railcars. Iezzi 70:17-24, 71:8-13, 75:9-76:10, 78:4-14; Meyer 41:14-24, 52:19-53:19; Rocha 491:4-17; FCA 30(b)(6) 286:10-288:20; Tonn 104:18-105:3. Mitsui retained ESi to evaluate different repair proposals and concluded that only a complete removal of the D-F paint

would be effective. Daum 24:12-28:9. D-F's refusal to cooperate delayed the repair investigation. Meyer 43:4-44:1. As time passed, the paint damage worsened on the railcars. FCA 30(b)(6) 276:19-277:12, 329:16-330:11, 331:13-18. Mitsui's vice president of operations noted that "[w]e had seen cars that had shown proper hardness, but then – but then regress and actually turn somewhat unacceptable again." Andersen 94:18-19; *id.* 90:11-92:7.

30.     The 300 railcars were repaired at two repair facilities and inspected by FCA and Mitsui and approved. Meyer 58:19-59:5; Ex. 50; Michael Selapack of FCA monitored the repair process, which was lengthy and expensive due to the gummy nature of D-F's uncured, defective paint. FCA 30(b)(6) 347:24-351:4, 351:17-352:10, 354:18-356:20, 357:6-12, 360:16-362:2.

31.     FCA's Independent Experts Have Opined that the Root Cause was Defective D-F Paint. FCA's industrial coating expert, Dr. Iezzi, has opined that the root cause of the paint blistering was poor formulation and too much solvent. Ex. 41. Dr. Iezzi inspected dozens of the blistered cars in Georgia and Alabama and conducted numerous tests of D-F paint, concluding that "the root cause of the [D-F] paint blistering was poor formulation that prevented the coating from drying properly" due the high levels of solvent and plasticizer in the formula. Iezzi 23:7-18, 23:22-24:2, 36:15-37:1; 93:25-96:22. Dr. Iezzi refuted the opinions proffered by D-F's retained expert, Dr. Hegedus. Iezzi 59:14-60:20, 61:17-63:22. ESi's railroad engineer opined that the root cause of the paint blistering was the D-F formulation and that FCA complied with D-F's paint specifications, including the proper dft thickness level. Daum 132:16-133:6, 138:5-139:11, 70:20-72:5, 78:23-79:1; *id.* at 41:24-49:25, 50:1-59:1-11; Ex. 43 at pp 46-49. Nor did FCA's Hygrex dehydrator system cause the blistering. Daum 60:25-64:6.

32.     D-F never told FCA that other D-F customers had had prior paint blistering issues

that D-F had never resolved. D-F 30(b)(6) (Henning) 36:10-37:12.[4] D-F's former chemist had prepared a D-F lab request to investigate the root cause of blistering and noted that "too much Texanol [solvent] appears to be the problem," but D-F never resolved this problem and "none of the formulas exhibited improved blistering resistance" prior to 2019. Ex. 42; D-F 30(b)(6) (Henning) 31:21-33:25, 34:1-24, 36:5-8, 43:7-20. D-F made false reassurances to FCA on November 5, 2019, when D-F's CEO Cal Henning wrote that D-F had "undertaken an aggressive development and testing program" and that D-F's Water-Tuff paints had successfully avoided blistering when applied up to 9 mils dft. Ex. 44; Henning 136:12-139:17. D-F never disclosed any of this purported testing because it did not exist. *Id.* 141:20-23. D-F's former chemist testified that there was no development or testing program before he left D-F on September 27, 2019, he never saw any test results showing satisfactory performance up to 9 mils dft, and other railcars had blistered at less than 6 mils dft. Crouch 44:12-45:2, 40:6-12, 45:4-12. D-F's other chemist admitted the only testing he was aware of showed that D-F's paints blistered at 9 mils dft (and lower). D-F 30(b)(6) (Lowe) 101:16-23, 102:8-13; Lowe 152:5-155:5.

33.     D-F chemist Lowe's notes and admissions at his recent deposition confirm that D-F knew that its Water-Tuff paint blistered at greater than *5* mils dft. DF2518 (Ex. 1); *id.* at DF2517 ("All 3 [Water-Tuff colors] blister at 7+"); D-F 30(b)(6) (Lowe) 55:6-18, 56:14-57:2, 54:20-24, 57:3-9. Lowe testified that his efforts to eliminate blistering by testing additives to the Water-Tuff formula in November and December 2019 failed. D-F 30(b)(6) (Lowe) 8:7-21, 12:12-15.

34.     D-F never told FCA that D-F knew by December 2019 that D-F's paint blistered at

---

[4] In 2018, FCA noted small amounts of blistering after using D-F Water-Tuff paint on a railcar order. D-F did not do any investigation of that blistering. D-F 30(b)(6) (Henning) 46:6-11, 52:17-54:9. Although D-F knew from prior blistering issues that its formula had too much solvent in it, D-F misled FCA at that time by misrepresenting that there was no established root cause for the blistering. Henning 131:6-20.

greater than 5 mils dft. D-F 30(b)(6) (Lowe) 57:10-20. Instead, D-F gave FCA test results purporting to state that D-F's Water-Tuff paints passed and did not blister at 6 mils dft. *Id.* 60:2-61:9. D-F cannot explain the discrepancy between what D-F told FCA and what D-F knew about its defective paint. *Id.* 63:1-16: "I don't have a good answer" to explain why D-F reported different blistering test results than what was reflected in D-F's chemist's notes. *Id.* 63:17-64:18; *see also id.* 68:25-69:9 ("I don't have a good explanation"). Nor does D-F have any explanation as to why it hid from FCA the Blister Studies D-F began conducting in November 2019. *Id.* 80:7-9.

## Argument

### I. GENUINE DISPUTED FACTS AS TO THE CAUSE OF THE D-F PAINT FAILURE BAR SUMMARY JUDGMENT.

The evidence, including deposition admissions by D-F, contemporaneous notes of D-F's own chemist, and FCA's two independent expert opinions establish that a genuine factual dispute exists as to whether D-F's poor paint formulation constituted a breach of its contract to sell FCA a protective railcar coating fit for its intended purpose, and whether FCA suffered damages as a result of D-F's breach of contract and breach of the implied warranties as set forth in Counts I, II and III of the Complaint. *Supra,* ¶31. D-F focuses solely on limited facts to argue that there is no genuine dispute that FCA "over-applied" the D-F paint and thus FCA has no remedy whatsoever. But D-F's brief overlooks the overwhelming evidence that FCA did in fact comply with D-F's paint recommendations and industry standards. *Supra,* ¶¶5-14. FCA has directly refuted the assertions by D-F that FCA somehow "over-applied" the paint and that FCA did not sufficiently comply with the environmental recommendations. *Supra,* ¶¶20-27; *see also* Expert Reports of ESi (Ex. 43) and Dr. Iezzi (Ex. 41).

### II. D-F IS NOT ENTITLED TO SUMMARY JUDGMENT ON FCA'S BREACH OF CONTRACT AND IMPLIED WARRANTY CLAIMS IN COUNTS I, II, AND III.

D-F focuses solely on a 2017 Limited Warranty which contains no integration clause and contains no language limiting all of FCA's remedies – regardless of source of duty or legal theory – solely to any remedies in that document. D-F's argument is contrary to well-established contract and UCC law, as well as the 2019 Purchase Order and testimony in this record regarding D-F's oral representations and misrepresentations.

"Under Virginia law, '[c]ontracts are construed as written, without adding terms that were not included by the parties.'" *Harris v. Mariner Fin. LLC*, No. 3:18cv588, 2019 WL 4060336, at *7 (E.D. Va. Aug. 28, 2019) (citation omitted). When the language of a contract is "clear and unambiguous, the contract must be construed according to its plain meaning." *Parikh v. Family Care Ctr., Inc.*, 641 S.E.2d 98, 100 (Va. 2007); *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 405 (4th Cir. 1998). In *Cortez-Melton v. Capital One Financial Corp.*, No. 3:19CV127, 2021 WL 771754, at *7 (E.D. Va. Feb. 26, 2021), the court held that a contract stating that "this Agreement is governed by . . .Virginia law" is narrow and cannot be interpreted to apply Virginia substantive law to claims beyond the plaintiffs' breach of contract claims. *See Hussain v. ImpactOffice, LLC*, 94 Va. Cir. 443 (2016) (plain language of narrow choice-of-law provision limited its application to claims for breach of that agreement only).

The 2017 Warranty's plain language applies Virginia law only to "[t]his Warranty and all rights and obligations hereunder . . . ." Compl., Ex. B, ¶13. In 2019, when FCA issued the Purchase Order, D-F accepted those new terms by shipping the paint and accepting payment. *See* 810 ILCS 5/2-207; *Hunter Tech. Corp. v. Omega Glob. Techs., Inc.*, No. 1:20-CV-4858, 2020 WL 7078382, at *3 (N.D. Ill. Dec. 3, 2020), *reconsideration denied*, No. 1:20-CV-4858, 2021 WL 392699 (N.D. Ill. Feb. 4, 2021) (purchase order became binding contract under UCC upon seller's acceptance by performance). The 2019 Purchase Order contains a *broader* warranty in paragraph 4, the

foundation of Count I, which is *not* limited by the prior 2017 Warranty. (Compl., Ex. A, ¶4) Similarly, the implied warranty claims in Counts II and III, which arise out of the UCC and not out of the 2017 Warranty, are independent of and not excluded by the claim in Count IV for breach of the 2017 Warranty.

D-F was free to draft a warranty that excluded the implied warranties of fitness and merchantability and that modified and excluded FCA's remedies so as to make breach of the 2017 Warranty the sole and exclusive remedy available, but *D-F did not draft such limitations*. *See* 2017 Warranty, Ex. B to Complt.; 2019 Purchase Order, Ex. A to Complt. D-F ignores the 2019 Purchase Order and the UCC, assuming that only the 2017 Warranty controls all disputes between the parties. The plain language of the terms of the 2017 Warranty, written by D-F, does *not* contain any waiver or exclusion of the UCC implied warranties and does *not* contain and language limiting FCA's remedies solely and exclusively to any remedies in the 2017 Warranty. Nor does the 2017 Warranty contain any integration clause precluding any other oral or written agreements. D-F cannot now rewrite its written 10-year warranty after the fact.

There is no dispute that the parties are merchants under the UCC and that FCA issued the 2019 Purchase Order attached as Exhibit A to the Complaint that constitutes a contract for the 2019 sale of paint at issue here. Compl., ¶¶45-54; Ex. A. Nor is there any dispute that the 2019 Purchase Order contained a broad warranty in paragraph 4 requiring *full indemnification* for losses:

> The Seller *expressly warrants that all materials, articles or work covered hereby will conform to specifications, will be suitable for the intended use and will be free from defect*…Seller *will indemnify the Buyer against any loss or liability that may result from such defect under any guaranty undertaken by the Buyer* in respect of such parts or complete articles or material or work.

Ex. A to Compl. At ¶4 (emphasis added). Nothing in the 2019 Purchase Order, which was issued *after* the 2017 Warranty, evinces any intent to limit the indemnification "against *any loss or*

*liability that may result from such defect"* to the $5,000 per railcar repair cap in the 2017 Warranty. Nor is there any language in the 2017 Warranty that provides that it applies to the subsequently agreed-upon 2019 Purchase Order contract. Thus, the 2017 Warranty damages limitation applies only to Count IV based on breach of the representations in that 2017 Warranty.

Virginia has adopted the UCC. Va. Code §§ 8.1A-101, *et seq.* Under Virginia Code § 8.2–314, a warranty of merchantability is implied in every contract for the sale of goods *unless* the warranty is "excluded or modified" pursuant to § 8.2–316. *Buettner v. R.W. Martin & Sons, Inc.,* 47 F.3d 116, 118 (4th Cir. 1995).

The UCC permits a merchant to exclude implied warranties of fitness and merchantability, but only if it complies with the provisions of the UCC by expressly disavowing such warranties. *See* Va. Code, §8.2-316. As in *George v. Bromwell's – The Fireplace People, LLC,* 425 F. Supp. 3d 632, 636 (E.D. Va. 2019), the issue "[w]hether [the 2017 Warranty] excludes or disclaims the implied warranty of merchantability is easily answered." As the court in *Bromwell's* stated: "In this respect, Virginia law makes unmistakably clear that any attempt to exclude an implied warranty of merchantability is ineffective if the exclusion provision does not specifically mention 'merchantability.'" *Id.* At 636 (citing Va. Code § 8.2-316(2)). As in *Bromwell's,* the 2017 Warranty contains *no* explicit reference to "merchantability." Thus, D-F has not effectively excluded or disclaimed the implied warranty of merchantability. *See id.*

Moreover, the 2019 Purchase Order does in fact explicitly reference a broader guaranty and broader remedy, further confirming the parties' intent *not* to exclude or disclaim the implied warranty of merchantability. Specifically, paragraph 4 of the General Conditions of the 2019 Purchase Order provides:

> The Seller guarantees that parts or complete articles or material or work found defective within one year will be replaced without charge *and in addition the*

> *Seller will indemnify the Buyer against any loss or liability that may result from such defect* under any guaranty undertaken by the Buyer in respect of such parts or complete articles or material or work.

Compl., Ex. A, ¶4 (emphasis added). Because D-F *never* excluded the UCC implied warranties, which are beyond the scope of the 2017 Warranty, FCA is entitled to sue for breach and is not limited in its damages claim by the 2017 Warranty. *Benedict v. Hancock Tire Co. Ltd.,* 295 F. Supp. 3d 632, 656 (E.D. Va. 2018) (written warranty stating that it was "exclusive and in lieu of any other warranty" lacked conspicuity and thus did not limit plaintiff's remedies); *see also Imperial Stamp & Engraving Co. v. Bailey*, 403 N.E.2d 294, 296–97 (Ill. App. 1980) (seller's warranty language was not sufficiently clear and specific to apprise the buyer of waiver of implied warranties).

The cases D-F relies upon are distinguishable because none of them contained separate, subsequently agreed-upon, broad warranties and guaranties as set forth in the 2019 Purchase Order, and none of them concerned a written warranty, like D-F's 2017 Warranty here, that contains *no express disavowal of the implied warranties of fitness and merchantability.* Nor did D-F raise warranty disclaimer as an affirmative defense in its Answer, as required. *See Walker v. All. Outdoor Grp., Inc.*, No. 3:20CV773-HEH, 2021 WL 4887972, at *3 (E.D. Va. Oct. 19, 2021); Answer, pp. 11-12.

 Nor does the 2017 Warranty limit all of FCA's remedies for breach of the implied warranties and breach of the 2019 Purchase Order. *See* Compl., Ex. B. In the absence of language limiting any and all of FCA's remedies regardless whether the duty arose out of the 2017 Warranty representations or was beyond the scope of the 2017 Warranty, FCA is free to pursue UCC implied warranties and other claims beyond and outside of the 2017 Warranty.

The 2017 Warranty also failed its essential purpose. Virginia Code §8.2-719(2) provides:

"where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this act." As Official Comment 1 explains, "where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article." Va. Code § 8.2–719 official cmt. 1, *cited in Goodrich Corp. v. BaySys Techs., LLC,* 873 F. Supp. 2d 736, 746 (E.D. Va. 2012).

Here, the 2017 Warranty failed: its essential purpose was to provide for D-F to repair or pay for repairs of railcars damaged by defects in D-F's paint. The record demonstrates, however, that D-F lied to FCA, intentionally blamed FCA knowing that its own paint was defective and blistered within D-F's specifications, refused to cooperate, refused to recommend reasonable repairs, refused to pay for any portion of the repairs, and all 300 railcars were damaged due to D-F's defective paint, requiring FCA to remove the defective paint completely and repaint the railcars with another paint. FCA agreed in the 2017 Warranty that remedies would be limited in exchange for D-F's undertaking in that Warranty; by breaching its obligations, D-F deprived FCA of the benefit of its bargain and as the 2017 Warranty fails, any damages limitation fails with it. In other words, D-F cannot materially breach and simultaneously seek to enforce a favorable limitation provision. FCA is entitled to seek the full remedies under the UCC. *See Goodrich,* 873 F. Supp. 2d at 746 (limited warranty failed of its essential purpose when seller did not timely replace or repair the defective cabinets which were 65% of the total cabinets).

D-F cannot claim upset expectations because after it issued the 2017 Warranty, it accepted the 2019 Purchase Order, which unambiguously provides for *full indemnification* without limitation for any breaches of the implied warranties in the 2019 Purchase Order. Thus, the $5,000 per railcar repair cost limitation in the 2017 Warranty applies solely to Count IV, which is the

claim based on breach of the specific 2017 Warranty.

D-F ignores the plain language of the 2017 Warranty, which precludes only "indirect, consequential and/or incidental damages . . . ." Compl., Ex. B, ¶3(c). There are two broad categories of damages *ex contractu*: "direct (or general) damages and consequential (or special) damages. *Roanoke Hosp. Ass'n v. Doyle & Russell, Inc.,* 214 S.E.2d 155, 160 (Va. 1975). Direct damages "are those which arise 'naturally' or 'ordinarily' from a breach of contract; they are damages which, in the ordinary course of human experience, can be expected to result from a breach." *Id.* Consequential damages "are those which arise from the intervention of 'special circumstances' not ordinarily predictable." *Id.* The plain language of the 2017 Warranty bars only *indirect* and consequential damages, and does *not* bar direct damages. FCA's damages are direct and compensable. It was reasonable to expect that if D-F breached by selling defective paint and refused to repair, then FCA would have to incur repair costs to repair damage caused by the defective paint. The brand-new railcars could not be leased or used without the repairs and the only viable method of repair was to remove the defective D-F paint and repaint them. It was within the contemplation of D-F, which regularly sold industrial railcar coatings to its customers in Illinois and which knew its paint had too much solvent and resulted in blisters, that its defective paint would result in significant costs to remove and replace, and that such repairs would necessarily require storage and freight costs for the 300 railcars.

Finally, D-F's fraudulent concealment and reckless disregard for the damage its defective paint could and did cause constitutes unconscionable circumstances that should preclude D-F from eschewing liability.

## III. D-F IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT CLAIM.

D-F is not entitled to judgment as a matter of law on FCA's claim under the Illinois Consumer Fraud and Deceptive Trade Practices Act (the "ICFA"). First, the 2017 Warranty's choice-of-law provision, which applies to "all rights and obligations *hereunder*" (Compl., Ex. B, ¶13; emphasis added), by its terms does not apply to a claim for fraud or deceptive practices. *See ITCO Corp. v. Michelin Tire Corp.,* 722 F.2d 42, 49 n.11 (4th Cir. 1983), *cert. denied,* 469 U.S. 1215 (1985). In *ITCO,* the court explained that the North Carolina Uniform Deceptive Trade Practices Act claim applied despite a contractual choice-of-law clause, because "the nature of the liability allegedly to be imposed by the statute is *ex delicto*, not *ex contractu*." *Id.* Thus, because Count V arises out of an *ex contractu* duty, the limited choice-of-law provision in the 2017 Warranty does not apply. *See also LTD Mgmt. Co., LLC v. Holiday Hospitality Franchising, Inc.,* 2008 WL 7281926, at *10 (E.D. Va. Mar. 11, 2008) (holding choice-of–law clause was not broad enough to encompass contract-related tort claims such as fraud claim); *Freedman v. Am. Online. Inc.*, 325 F. Supp. 2d 638, 653 (E.D. Va. 2004) ("a choice-of–law provision that, by its terms, applies only to the parties' contract or agreement must not be construed to govern the entirety of the parties' relationship and any claim that may arise from that relationship").

The cases D-F cites are distinguishable. *Pyott-Boone Elecs. Inc. v. IRR Tr. for Donald L. Fetterolf Dated Dec. 9, 1997*, 918 F. Supp. 2d 532, 550 (W.D. Va. 2013), for example, involved a fully integrated Stock Purchase Agreement with a Delaware choice-of-law provision and an anti-reliance clause that barred fraud claims. Here, Virginia, the forum, supplies the choice-of-law rules. For tort-based claims, Virginia applies the *lex loci delicti* rule, which, in the fraud context, is where the loss is sustained. *Self Insured Servs. Co. v. Panel Sys., Inc.,* 352 F. Supp. 3d 540, 551-53 (E.D. Va. 2018). FCA's place of injury is Illinois where it is headquartered.

D-F overlooks the provisions of the ICFA, which states that "any person" may bring an

action under the Act, and a "person" includes "The text of the ICFA, however, uses a broader definition, providing that "any person" may bring an action under the ICFA and defining "person" as: "any natural person or his legal representative, partnership, corporation (domestic and foreign), company, trust, business entity or association, and any agent, employee, salesman, partner, officer, member, stockholder, associate, trustee or cestui que trust thereof." 815 ILCS §§ 505/1, 505/10a. A plaintiff must show that (1) the defendant engaged in a deceptive act or practice, (2) with the intent that the plaintiff rely on the deception, (3) in the course of trade or commerce, and that (4) the deception was the proximate cause of the claimant's alleged injury. *ABN Amro, Inc. v. Capital Int'l, Ltd.,* 595 F. Supp. 2d 805, 848-49 (N.D. Ill. 2008). In *Lefebvre Intergraphics, Inc. v. Sanden Mach. Ltd.,* 946 F. Supp. 1358 (N.D. Ill. 1996), the plaintiff, a commercial printer, was held to be a "consumer" because it had purchased a printing press not "for resale in the ordinary course of his trade or business." *Id.* at 1368–69.

Here, FCA purchased paint for its own railcars and for use in manufacturing railcars for others, *supra,* ¶1, and thus is within the scope of the ICFA. Moreover, the defective paint sold by D-F implicated public environmental and safety concerns, as described by Mitsui. *Supra,* ¶10.

## IV.    D-F IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS AFFIRMATIVE DEFENSE OF ALLEGED FAILURE TO MITIGATE.

D-F does not establish that it is entitled to summary judgment on its affirmative defense that FCA allegedly failed reasonably to mitigate its damages. "It is only incumbent upon [a plaintiff] . . . to use reasonable exertion and reasonable expense," and the question is "whether the act was a reasonable one, having regard to all the circumstances of the particular case." *Haywood v. Massie,* 49 S.E.2d 281, 284 (Va. 1948) (citations omitted). "Whether [a] plaintiff's efforts to mitigate her damages were sufficient is a question of fact for the jury." *Antekeier v. Lab'y Corp. of Am.,* 295 F. Supp. 3d 679, 689 (E.D. Va. 2018) (denying summary judgment). As *Middle E.*

*Broad. Networks, Inc. v. MBI Glob., LLC*, 689 F. App'x 155, 162–63 (4th Cir. 2017), cited by D-F, explained, "[n]on-breaching parties are only held to a 'reasonableness' standard, and a defendant alleging that a plaintiff acted unreasonably in its mitigation efforts must show that the plaintiff enjoyed a windfall 'special benefit' by acting as it did." (Citations omitted). Thus, *Middle E. Broad Networks* held that the defendant's argument that the plaintiff "could have mitigated more effectively . . . . fails." *Id.* at 163.

FCA reasonably mitigated. First, it had a duty either to return to Mitsui the purchase price of $21.475 million or repair the 300 railcars, and it reasonably chose to repair them. Second, FCA retained an industrial coatings expert in December 2019 to advise regarding repairs and tested to determine a reasonable approach. Third, FCA explored lower-cost alternatives for repairs, but test results by FCA, Mitsui and their experts confirmed that D-F paint needed to be removed completely and another paint had to be applied to ensure the railcars were protected. FCA then monitored and completed the repair process. Mitsui had threatened to sue and FCA reasonably avoided litigation costs by completing the repairs. Mitsui has not purchased any more railcars from FCA, and D-F ignores the substantial damage FCA has suffered to its reputation and that loss of business due to the damaged railcars from the D-F paint failure.

### Conclusion

For the foregoing reasons, defendant's motion for summary judgment should be denied.

May 9, 2022                                    Respectfully submitted,


/s/  *Daniel J. Martin*


John P. Fishwick, Jr. (VSB #23285)
Carrol M. Ching (VSB #68031)
Daniel J. Martin (VSB #92387)
Fishwick & Associates PLC

30 Franklin Road, Suite 700
Roanoke, VA 24011
(540) 643-9772
john.fishwick@fishwickandassociates.com
carrol.ching@fishwickandassociates.com
daniel.martin@fishwickandassociates.com

Nancy A. Temple (PHV-IL#6205448)
Katten & Temple, LLP
209 S. LaSalle Street, Suite 950
Chicago, IL 60604
ntemple@kattentemple.com

*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on May 9, 2022, I electronically filed the foregoing Plaintiff's Response to Defendant's Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system which sent notification of filing to all counsel of record.

/s/ *Daniel J. Martin*

John P. Fishwick, Jr. (VSB #23285)
Carrol M. Ching (VSB #68031)
Daniel J. Martin (VSB #92387)
Fishwick & Associates PLC
30 Franklin Road, Suite 700
Roanoke, VA 24011
(540) 643-9772
john.fishwick@fishwickandassociates.com
carrol.ching@fishwickandassociates.com
daniel.martin@fishwickandassociates.com

Nancy A. Temple (PHV-IL#6205448)
Katten & Temple, LLP
209 S. LaSalle Street, Suite 950
Chicago, IL 60604
ntemple@kattentemple.com