**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**LYNCHBURG DIVISION**

| | | |
|---|---|---|
| FREIGHTCAR AMERICA, INC.,<br>a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>DAVIS-FROST, INC.,<br>a Minnesota Corporation,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 6:21-cv-00027-NKM |

## DEFENDANT DAVIS-FROST, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff FreightCar America, Inc.'s ("FCA") claims should be dismissed because it improperly applied Davis-Frost, Inc. ("Davis-Frost") industrial coating (paint) to steel railcars resulting in cosmetic defects appearing on the finished paint. FCA and Davis-Frost have been doing business for years, with David-Frost selling paint to FCA that FCA applied to railcars FCA manufactured. In 2017, Davis-Frost and FCA agreed to a limited 10-year warranty for Davis-Frost's Water Tuff paints. In 2019, FCA purchased Mineral Brown Water Tuff paint from Davis-Frost to be applied to 100 3 x 53 well railcars FCA contracted to build for Mitsui Rail Capital ("Mitsui"). The undisputed evidence demonstrates FCA failed to adhere to Davis-Frost's application specifications when applying the Mineral Brown paint and as a result, overapplied the paint (put too much paint on the cars). Within months of being painted, the railcars exhibited blisters and other cosmetic defects, conditions Davis-Frost warned FCA could happen if the paint was overapplied. Instead of utilizing the required procedure and abiding by the $5,000 per car limitation on damages provided in the 2017 warranty, FCA hired third parties to remove all of the

1

paint and repaint the railcars at an expense far in excess of that provided for in Davis-Frost's warranty. It appears FCA was motivated by a desire to preserve its relationship with Mitsui rather than follow the terms of the Davis-Frost warranty. FCA seeks to shift the financial burden of its errors and business decisions to Davis-Frost when it is FCA that misapplied the paint and voluntarily incurred substantial additional expense to strip and repaint the railcars.

This Court should enter summary judgment all counts in the complaint because as a matter of law FCA cannot identify facts in the record sufficient to proceed to trial on its breach of contract or warranty claims or on its Illinois Consumer Fraud claim. Additionally, and alternatively to the extent any of FCA's claims survive this motion, FCA's damages at trial should be limited per the terms of the Warranty and based on the doctrine of mitigation of damages.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.      The Warranty and Purchase Order**

1.      In 2019, FCA contracted to build 100 3 x 53 well railcars at FCA's facility located in Muscle Shoals, Alabama ("Shoals Facility")[1] for Mitsui.

2.      In 2017, Davis-Frost provided to FCA a Protective Coatings New Rail Car Warranty (the "Warranty"). (Compl. Ex. B; Dep. Ex. 169, Dec., Ex. A.)[2] The Warranty, which is governed by Virginia law, provides that Davis-Frost's Water-Tuff coatings "shall be free of all defects including, but not limited to, those defects resulting in corrosion, blistering, flaking delaminating, peeling or checking, for a term of 10 years." (Compl. Ex. B; Dep. Ex. 169, Dec., Ex.

---

[1] This facility may also be referred to by either party as the Cherokee, Alabama facility.

[2] References to the record in this brief will be by witness name and page/line citation for transcripts, exhibit number for deposition exhibits ("Dep. Ex."), name of other documents with page citations, and will include a letter exhibit referenced to the April 8, 2022 Maier Declaration ("Dec."). For example, Smith Dep. 1:1 to 1:15, Dep. Ex. X; Dec. Ex. X.

A.) Paragraph 2.01 dictates how FCA and Davis-Frost must proceed if FCA notifies Davis-Frost of any defects related to the paint:

> Upon notification from FreightCar in accordance with Section 4 hereof, the Company will, at FreightCar's sole discretion, either (i) proceed to repair any and all Defects in the Product, all at the Company's sole cost and expense **not to exceed $5,000 per railcar** utilizing repair facilities mutually agreed upon by the Company and FreightCar, or (ii) provide FreightCar with the replacement coating materials as may be necessary to repair the Defects in accordance with this Warranty and will reimburse FreightCar for all reasonable costs associated with the application thereof **not to exceed $5,000 less the actual cost of material per railcar**.

(Compl. Ex. B; Dep. Ex. 169, Dec. Ex. A ¶ 2.01.)

3.      The warranty provides that Davis-Frost "shall have no obligations to FreightCar with respect to" * * * "e) Any deterioration or defects of the Product caused by improper application including, but not limited to, off-ration mixing, low or high film thickness (specific guidelines provided by the Company), improper substrate preparation or applications performed under unacceptable environmental conditions." (Compl. Ex. B; Dep. Ex. 169, Dec. Ex. A ¶ 3.)

4.      By purchase order dated April 18, 2019 (purchase order and accompanying general conditions collectively referred to as the "Order"), and subject to the Warranty, FCA purchased Davis-Frost's Mineral Brown Water-Tuff paint to be applied to the railcars. (Compl. Ex. B; Dep. Ex. 169, Dec. Ex. A ¶15; Dep. Ex. 6, Dec. Ex. E; Dep. Ex. 7, Dec. Ex. H.).

**B.      Paint Application Instructions**

5.      Davis-Frost provided FCA with the Mineral Brown Product Data Sheet for the Mineral Brown paint and Davis-Frost's "Paint Procedure – New / Repair Cars Water-Tuff DTM" to FCA. (Dep. of Chad Murray ("Murray Dep") 100:8-101:4; Dec. Ex. B; Dep. of Gregory Josephson ("Josephson Dep") 61:23-62:15; Dec. Ex. C.)

6. The thickness of the Mineral Brown paint is measured to 1/1000 of an inch, which is also referred to as a mil. (Josephson Dep. 56:12-19, Dec. Ex. C.) The measurement unit of the thickness of wet paint is referred to as "wet mils" and it is measured using a wet mil gauge. (Josephson Dep. 6:21-6:15, Dec. Ex. C.) The thickness of dry paint is measured by a dry film thickness reader and the measurement is referred to as a "dry film thickness reading" or a "dft" reading. (Dep. of Barry Bane ("Bane Dep") 28:22-29:2; Dec., Ex. D.)

7. The Mineral Brown Product Data Sheet recommends film thickness at a "minimum of 4 -5 mils D.F.T., 12 – 15 mils wet". (Dep. Ex. 6, Dec. Ex. E at 1.) The Product Data Sheet also warns about overapplication. It states: "Do not over apply. Recommended wet mil application is 12-16 mils for direct-to-metal use. Higher mils can cause blistering in the field due to lack of uniform drying." (Dep. Ex. 6, Dec. Ex. E at 2.)

8. Greg Josephson, FCA's Vice President of Engineering, testified that FCA used the Product Data Sheet as a guideline when painting the railcars. (Josephson Dep. 61:23-62:15, Dec. Ex. C.) Barry Bane, a prior FCA employee who served as a technical supervisor for the coatings department at FCA's Roanoke, Virginia facility testified that he used the Product Data Sheet "to teach, coach and train" and that he would instruct his painters that "this is the Bible of the coating, you don't deviate from this. This tells you how the manufacturer designed and manufactured the coating, that you shouldn't go outside the parameters of what they designed it for." (Bane Dep. 14:2-10, 50:11-51.5, Dec. Ex. D.)

9. Bane testified that blistering from over application was well-known. (Bane Dep. 63:6-64:7, Dec. Ex. D. He also testified that FCA at the Virginia Facility had applied Davis-Frost Mineral Brown paint for years without issue, including some of the same batches of paint that was

applied to the subject Mitsui cars at the Shoals Facility. (Bane Dep. 47:25-48:24; 60:23-61:19, Dec. Ex. D; Dep. Ex. 186, Dec. Ex. F; Dep. Ex. 187, Dec. Ex. G.)

10.     Davis-Frost's "Paint Procedure – New / Repair Cars Water-Tuff DTM" instructs, "Spray cars to a dry film thickness of 4-8 mils not to exceed 8 mils dry film thickness." (Dep. Ex. 134, Dec. Ex. N at 1.) The Paint Procedure warns that blistering may occur under certain circumstances, including, "If dry film thickness is above recommendation prior to force dry." (Dep. Ex. 134, Dec. Ex. N at 1.) Chad Murray, a team lead overseeing painters on this railcar order at the Shoals Facility testified that had the Davis-Frost Paint Procedure when his team was painting these railcars. (Murray Dep. 20:13-16; 100:8-101:4, Dec. Ex. B.)

11.     Despite Davis-Frost's express warnings, there is undisputed evidence that the Shoals Facility regularly overapplied paint, including the Davis-Frost Mineral Brown. (Dep. Ex. 25, Dec. Ex. I; Bane Dep. 56:22-58:24; Dep. Ex. 10, Dec. Ex. J at FCA_004790-91; Dep. Ex. 12, Dec. Ex. K at FCA_005888-90; Murray Dep. 95:15-20; Dec. Ex. B; Dep. Ex. 22, Dec. Ex. L; Dep. Ex. 135, Dec. Ex. M; Dep. Ex. 134, Dec. Ex. N; Dep. Ex. 34, Dec. Ex. O; Rocha Dep. 424:22, Dec. Ex. P; Dep. Ex. 137, Dec. Ex. Q.)

12.     For example, Mr. Bane recalls observing blistered Mineral Brown paint at the Shoals Facility, and he concluded that the blistering was caused by over application of the paint. (Bane Dep. 59:24-60:18; 67:21-69:9, Dec. Ex. D.)

13.     Barry Bane testified that the Shoals Facility had an unskilled new workforce and that he was asked to visit the Shoals Facility because the painters were overapplying paint in excess of the manufacturer's millage recommendation. (Bane Dep. 25:6-16; 56:22-58:24, Dec. Ex. D.)

14.     FCA's 30(b)(6) witness, Joel Rocha, testified that Davis-Frost's specifications were 4 to 8 mils and a reading outside of those parameters would be outside of the specifications. (Dep.

of Joel Rocha ("Rocha Dep") 424:22-426:18; Dec. Ex. P.) FCA's paint maps, on which FCA recorded post-production dft readings, reflect numerous dry film thickness readings above 8 mils evidencing overapplication. (Dep. Ex. 10, Dec. Ex. J at FCA_004790-91; Dep. Ex. 12, Dec. Ex. K at FCA_005888-90.)

15.     In addition to the paint maps, witnesses testified that the Mineral Brown paint was being applied in excess of Davis-Frost's specifications. Chad Murray, who was a FCA team lead overseeing painters on the subject Mitsui order, instructed his painters to apply 18 to 20 wet mils of paint, far in excess of the recommendation (Murray Dep. 20:13-16; 95:15-20, Dec. Ex. B.) Paint usage data provided by FCA after discovering blisters on the subject cars also demonstrates an excess amount of paint was applied to these railcars. FCA calculated that it consumed 12,256 gallons of paint 1,456 gallons of paint more than what was called for in the bill of materials for the build. (Dep. Ex. 22, Dec. Ex. L at FCA_007360; Josephson Dep. 155:15-156:16, Dec. Ex. C.)

16.     In addition, some of the railcars were painted under improper environmental conditions. FCA painted numerous railcars when the humidity levels, surface temperature, and dew points were outside of Davis-Frost's specifications. (Dep. Ex. 135, Dec. Ex. M; Dep. Ex. 134, Dec. Ex. N.)

17.     A post-production spreadsheet containing dry film thickness readings taken on some of the subject cars during an inspection in Dawson demonstrate many dft readings in excess of Davis-Frost's specifications. (Dep. Ex. 34, Dec. Ex. O; Josephson Dep. 200:13-201:11, Dec. Ex. C.) In fact, the dft readings from 16 cars inspected post-production exhibit numerous readings below the 4mil minimum specification and above the maximum 8mil dft specification. (Dep. Ex. 34, Dec. Ex. O.)

**C.     Observation of Blemishes and Investigation**

18.     In November 2019, Mitsui informed FCA that it observed blisters and other cosmetic defects on the railcars that were being stored in Dawson, Georgia. (Josephson Dep. 121:1-5, Dec. Ex. C). At an inspection, representations from FCA, Davis-Frost, and Mitsui took dry film thickness readings. (Dep. of Michael Selapack ("Selapack Dep") 241:17-22; Dec. Ex. R.) Michael Selapack, who served as Manager of Service for FCA during the relevant time period, testified that he took dry film thickness readings as high as 20 on some places on the cars. (Selapack Dep. 237:7-17; 225:7-23, Dec. Ex. R.) An email from Rob Marchio, a Mitsui employee that was present at the inspection, wrote in an email to FCA employees after the inspection stating, "We were taking mill readings on the sides that were in the high teen to the mid 20's in spots." (Dep. Ex. 17, Dec. Ex. S.) In the same email he also requested the paint sheets for the 100 cars to "look at the averages that were taken." (*Id.*)

19.     On November 25, 2019, FCA employees presented the findings of the Dawson inspection to FCA's upper management. (Dep. Ex. 21, Dec. Ex. T; Selapack Dep. 263:6-265:18, Dec. Ex. R.) The presentation stated, "Paint irregularities fluctuated from 6 mils to 1" away at 19 mils" and "Irregularities on vertical surfaces ran between 11-20 mils," and that "Irregularities on horizontal areas tested the heaviest at 7-30 mils. One location at 37.1 mils." (Dep. Ex. 21, Dec. Ex. T.)

20.     FCA's own internal correspondence noted that overapplication was occurring such as in a December 4, 2019 email in which Paul Underwood, an FCA employee, noted that "Joel mentioned having to over-apply at times to get appropriate sheen. DF agreed." (Dep. Ex. 138, Dec. Ex. U.)

21.     In a PowerPoint created by FCA during its investigation it explored the issue of high dry film thickness in the paint application process. (Dep. Ex. 25, Dec. Ex. I). Slide 8 contains

"Why?" statements related to the painting process such as, "Why? Sprayer did not pay attention to wet mils gauge or did not use wet mils gauge," "Why? Why did Sprayer not understand proper wet mils to apply for DFT results," and "Why? Even with high dft averages is (sic) designated mil map areas, the Production Operator who records dft did not react to, not informed (sic) supervision." (Dep. Ex. 25, Dec. Ex. I at FCA_006385.)

22.     In a letter dated December 19, 2019 to Mitsui, Matthew Tonn, FCA's Chief Commercial Officer addressed the paint issues. Matthew Tonn wrote, "Simultaneous FCA car builds (Shoals and Roanoke Plants) of 50 and 200 cars were completed using the same Davis Frost Paint, painted during the same time frame, using the same equipment, and performed by the same personnel. None of the other cars exhibit the paint condition" Matthew Tonn testified that he still thinks this statement is correct as of the date of his 2022 deposition. (Dep. of William Matthew Tonn ("Tonn Dep") 29:1-15; Dec. Ex. V.; Dep. Ex. 155, Dex. Ex. W.)

## D.     Repair Efforts

23.     In spring 2020, FCA considered multiple repair options. First, in February 2020, FCA considered curing (drying) the cars for additional time. (Dep. Ex. 156, Dec. Ex X.) FCA cured some railcars and reported test results that were "acceptable per FCA and Davis-Frost standards and guidelines." (*Id.*)

24.     In a February 2020 meeting between Mitsui and FCA, Tonn noted that "A complete review of the re-bake process was completed along with Bob Iezzie's analysis supporting the necessity to "force cure" the paint and that once cured the paint should perform at prescribed levels." (*Id.*) Tonn also wrote that "My notes indicate [Mitsui representative] was accepting of our repair process." (Dep. Ex. 28, Dec. Ex. Y.)

25.    In April 2020, FCA planned to remove the paint from the affected areas, sand portions of the railcars, and repaint the railcars at its facility. (Dep. Ex. 159, Dec. Ex. Z; Selapack Dep. 303:12-304:19 Dec. Ex. R.) FCA estimated this repair option would cost between $1,134,197 and $1,159,611. (Dep. Ex. 58, Dec. Ex. AA; Dep. Ex. 44, Dec. Ex. BB.) In a letter from Jim Meyer, FCA's President, to Mitsui's President, Meyer stated that once cured, "the physical properties of hardness and adhesion appear excellent," and that this is "the conclusions of Dr. Iezzi and supported by test results" and, notably, that "whether the paint finish is smooth or blistered as observed on the cars in Georgia, the adhesion qualities are excellent." (Dep. Ex. 214, Dec. Ex. CC at 2.) On April 28, 2020, FCA presented a detailed repair plan that included drying / sanding and partial repainting that FCA hoped that Mitsui would accept. Tonn 95:3-22 and Ex. 162. Despite the existence of a detailed plan, with positive test results, Mitsui demanded that FCA remove all of the paint and repaint the railcars. (Dep. Ex. 162, Dec. Ex. DD.)

26.    Mitsui and FCA have a Master Railcar Manufacturing and Purchase Agreement that provides FCA will not separately warranty component parts in railcars it manufactures, but that it will only pass to Mitsui the component part manufacturer's warranty. (Dep. Ex. 168, Dec. Ex. EE ¶9.) Paragraph 9 of the Agreement provides, "With respect to parts and materials manufactured by others and incorporated by [FCA] in the Cars, such parts and material shall be covered only by the warranty, if any, of the manufacturer thereof, and [FCA] shall be deemed to have assigned to Buyer any such warranty, to the extent assignable by [FCA], and [FCA] shall not provide any other relief or warranty with respect to such parts and materials. (Dep. Ex. 168, Dec. Ex. EE ¶9.) FCA passed-through the Warranty to Mitsui on this railcar order. (Tonn Dep. 67:8-68:5, Dec. Ex. V.)

**E.    FCA's Deal with Mitsui**

27.     FCA was focused on repairing the railcars in a way to preserve its relationship with Mitsui. Tonn, testified that "[Mitsui] are a good customer of FreightCar America. We value the relationship and wanted to rely to MRC our recognition of the seriousness of this matter and our commitment to bring it to a resolution." (Tonn Dep. 23:8-12, Dec. Ex. V.) Jim Meyer wrote to Mitsui by email on April 11, 2020 and stated, "We HIGHLY value our relationship with Mitsui." (Dep. Ex. 165, Dec. Ex. LL.) On April 15, Jim Meyer emailed some FCA employees and wrote "All – we have a sliver of hope this evening in rectifying some of the lost ground with Mitsui." (Dep. Ex. 159, Dec. Ex. Z at FCA_000286.)

28.     By June 2020, FCA and Mitsui had negotiated a deal that required FCA to remove all the existing paint and repaint all the cars in the build. In a June 11, 2020 letter FCA and Mitsui agreed that Mitsui will receive 20% of the proceeds, net of the attorneys' fees and costs, in any legal action against Davis-Frost. (Dep. Ex. 50, Dec. Ex. GG at FCA_009078.) FCA also agreed to provide a meaningful discount to Mitsui on any future railcar build. (*Id.*) FCA asserted that the Master Railcar Manufacturing and Purchase Agreement contained the warranty that it provided to Mitsui. (Selapack Dep. 250:9-16; 251:3-13, Dec. Ex. R.) FCA and Mitsui acknowledged the existence of the Master Railcar Manufacturing and Purchase Agreement and agree that the warranty provided in section 9 of that agreement remains in full force and effect. (Dep. Ex. 50, Dec. Ex. GG at FCA_009078.)

**F.     FCA knew that Mineral Brown paint could blister, under certain conditions.**

29.     FCA had bought and applied thousands of gallons of Mineral Brown paint between 2014 and 2019 and applied it without incident at both its Virginia and Shoals facilities. (Supra SOF 23; Bane Dep. 47:25-48:23; 49:11-16, Dec. Ex. D; Josephson Dep. 204:3-14, Dec. Ex. C.)

30.     FCA had Davis-Frost Water Tuff black paint blister during a 2018 build. The parties could not come to any agreement as to the root cause and agreed to split some costs

associated with railcar repair. Davis-Frost believed the cause was overapplication. Dep. of Calvin Henning ("Henning Dep") 127:16-131:20; Dec. Ex. HH; Dep. Ex. 85, Dec. Ex. II.)

31.     When FCA purchased and applied the subject paint in 2019, it had used Mineral Brown paint on railcars successfully for years (SOF ¶¶ 23, 30), it knew that under certain conditions Mineral Brown could blister (SOF ¶¶ 7, 8, 9 and 10) and it had itself in 2018 experienced blistering when applying Davis-Frost Water Tuff paint (SOF ¶ 31).

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), a court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party's failure to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" requires the court to enter summary judgment against that party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## ARGUMENT

### I.     VIRGINIA LAW SHOULD GOVERN FCA'S CLAIMS

This Court should determine that Virginia law governs the claims presented as the Warranty provides "[t]his Warranty and all rights and obligations hereunder shall be governed by the laws of the State of Virginia." (SOF ¶ 2.) "Virginia courts generally enforce choice-of-law clauses, 'unless the party challenging enforcement establishes that such provisions are unfair or unreasonable, or are affected by fraud or unequal bargaining power.'"[3] *Pyott-Boone Elecs. Inc. v. IRR Tr. for Donald L. Fetterolf Dated Dec. 9, 1997,* 918 F. Supp. 2d 532, 541 (W.D. Va. 2013).

---

[3] Because this lawsuit was transferred to this District based on the venue clause, this District should apply Virginia's choice of law analysis. *Olawole v. ActioNet, Inc.*, 258 F. Supp. 3d 694, 703 (E.D. Va. 2017); *see also* Case No. 20 C 07202, Dkt. No 25.

Here, Davis-Frost's principal place of business is in Virginia and therefore FCA would have no basis to argue this provision is unfair or unreasonable.

Despite the broad choice of law provision, FCA has previously contended that Illinois law should apply to all claims, except the breach of express warranty. This position is not supported by the facts or the law. As way of background, the Purchase Order was issued subject to the Warranty and therefore undeniably the parties intended for the Warranty provisions to apply to the entire transaction. (SOF ¶¶ 2, 4.) And FCA's claims are all predicated on the same question to be answered by this Court: Was FCA damaged by the alleged defective paint sold to it by Davis-Frost? (*See generally* Compl. Counts I-V.) Essentially, FCA would have this Court answer this question under both Illinois and Virginia law given its position. This approach, however, has been rejected the Fourth Circuit Courts when the choice of law provision broadly encompasses all claims. *See, e.g., Pyott-Boone Elecs. Inc.*, 918 F. Supp. 2d at 545 (finding "the Virginia Supreme Court would seek to apply sound commercial law that promotes outcomes consistent with the intent of the parties.") The *Pyott-Boone c*ourt reasoned "if parties wish to exclude causes of action arising in tort or by statute from the coverage of their agreement, they may do so, but they should reflect that intent in their contract." *Id.*

Likewise, here, the parties contractually agreed that all rights and obligations arising out of the Warranty shall be governed by Virginia law. Because FCA's claims all involve the rights and obligations under the Warranty—that is whether the product was defective and what are FCA's available remedies—this Court should promote consistency by applying Virginia law to each of FCA's claims. *See Zaklit v. Glob. Linguist Sols., LLC*, No. 1:14CV314 JCC/JFA, 2014 WL 3109804, at *9 (E.D. Va. July 8, 2014) (citing *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir.1999)) ("Where a choice-of-law clause in the contract is sufficiently broad to

encompass contract-related tort claims, Virginia courts will honor[ ] the intent of the parties to choose the applicable law and apply the provision to related, non-contract claims.")

## II.    SUMMARY JUDGMENT IS WARRANTED ON COUNTS I THROUGH IV BECAUSE FCA CAUSED THE SO-CALLED DEFECT

In Counts I through IV[4], FCA asserts that the Mineral Brown paint is defective because it blistered when used for its intended purpose, application to steel railcars, and as a result, FCA has been damaged. Each of these claims fail as a matter of law because the undisputed facts demonstrate the cause of the defect was not that the Mineral Brown paint was defective; rather, the cause was FCA's overapplication of the paint and environmental conditions at the time of the painting. In fact, Paragraph 3 of the Warranty provides, in relevant part, "The Company shall have no obligations to FreightCar with respect to:

> e) Any deterioration or defects of the Product caused by improper application including, not but limited to, off-ratio mixing, low or high film thickness, (specific guidelines provided by the Company), improper substrate preparation or applications performed under unacceptable environmental conditions."

(SOF ¶ 3.)

The record is replete with undisputed evidence that FCA overapplied the paint to the railcars. FCA's own production paint maps provide the main evidence of overapplication as they reflect numerous high film thickness readings throughout the build. Davis-Frost's Product Data Sheet for the Mineral Brown paint states that the recommended film thickness is "minimum of 4 - 5 mils D.F.T., 12 – 15 mils wet." (SOF ¶¶ 5-7.) The Product Data Sheet also provides a clear warning about overapplication: "Do not over apply. Recommended wet mil application is 12-16 mils for direct-to-metal use. Higher mils can cause blistering in the field due to lack of uniform

---

[4] Count I is Breach of Contract; Count II is Breach of the Implied Warranty of Fitness for a Particular Purpose; Count III is Breach of the Implied Warranty of Merchantability; and Count IV is Breach of Express Warranty.

drying." (SOF ¶ 7.) Davis-Frost also provided FCA with its "Paint Procedure – New / Repair Cars Water-Tuff DTM" that instructs, "Spray cars to a dry film thickness of 4-8 mils not to exceed 8 mils dry film thickness." (SOF ¶ 5.)

Despite FCA's use, reference and training based on the Product Data Sheet, FCA's paint maps demonstrate that FCA frequently applied the Mineral Brown paint in excess of Davis-Frost's specifications. (SOF ¶¶ 8, 13, 14.) FCA's paint maps contain numerous dry film thickness readings between 8 and 9.9 mils. (SOF ¶ 14.) Postproduction inspection reports further demonstrate that paint was over applied on the subject cars. (SOF ¶ 17.) FCA's calculation of paint usage on this order in comparison to the Bill of Materials demonstrates that FCA used 1,456 gallons of extra paint on this order which amounted to 14.56 extra gallons per car. (SOF ¶ 15.) FCA's own witness even conceded the painters were instructed to apply 18 to 20 wet mils, far in excess of Davis-Frost's application instructions. (SOF ¶ 15.)

Additionally, some of the railcars were painted under improper environmental conditions, which is demonstrated by FCA's own data showing FCA painted railcars when the humidity levels, surface temperature, and dew points were not within Davis-Frost's specifications. (SOF ¶ 16.) The undisputed evidence demonstrates that the blistering of the Mineral Brown paint was caused by FCA's overapplication and application during improper environmental conditions and not because the paint was "defective," this Court should grant judgment in Davis-Frost's favor on Counts I through IV.

## III.    FCA'S DAMAGES, IF ANY, SHOULD BE LIMITED

To the extent FCA can prove any of its claims against Davis-Frost, FCA's recoverable damages, if any, should be limited because: (1) the Warranty proscribes a claim procedure (which FCA did not follow); (2) the Warranty expressly places a $5,000 per car cap on repair expenses in

the event that FCA makes a valid claim under the Warranty; and (3) FCA failed to mitigate its damages by agreeing with Mitsui to unnecessarily incur more to repair the railcars than permitted by the express language of the Warranty.

### A.   The Plain Language of The Warranty Limits FCA's Remedies

As part of the transaction, the parties entered into the Warranty. (SOF ¶ 2.) The Purchase Order was issued pursuant to and subject to the Warranty. (SOF ¶ 4.) The Warranty expressly limits the remedies and amount of damages available to FCA if FCA establishes liability against Davis-Frost **and** further demonstrates the Warranty is applicable despite FCA's overapplication of the paint. Virginia's Uniform Commercial Code allows parties—in particular sophisticated parties—to contractually limit the remedies available under a warranty. UCC § 8.2-719(1)(a)-(b) (parties "may provide for remedies in addition to or in substitution . . . and may limit or alter the measure of damages recoverable.") *Redman v. John D. Brush and Co.*, 111 F.3d 1174, 1182 (4th Cir. 1997) ("Virginia law permits a manufacturer to tailor both the warranty protection offered and the remedies available for breach of warranty"). Moreover, it is well-established this Court must construe the Warranty's clear and unambiguous terms according to its plain meaning. *RECP IV WG Land Inv. LLC v. Cap.One Bank (USA), N.A.*, 811 S.E.2d 817, 825 (Va. 2018).

Specifically, Paragraph 2.01 of the Warranty provides two distinct processes if FCA were to notify Davis-Frost that it detected a paint. First, the warranty provides that the costs of repair of "any and all Defects" will be incurred **by Davis-Frost** up to $5,000 per railcar. (Compl. Ex. B, ¶ 2.0, emphasis added) The second limitation in Paragraph 2.01 provides:

> Upon notification from FreightCar in accordance with Section 4 hereof, the Company will, at FreightCar's sole discretion, either (i) proceed to repair any and all Defects in the Product, all at the Company's sole cost and expense **not to exceed $5,000 per railcar** utilizing repair facilities mutually agreed upon by the Company and FreightCar, or (ii) provide FreightCar with the replacement coating materials as may be necessary to repair the Defects in accordance with this Warranty and will

reimburse FreightCar for all reasonable costs associated with the application thereof **not to exceed $5,000 less the actual cost of material per railcar**.

(SOF ¶ 2) (Emphasis added). The Court should enforce the plain language of the agreement and determine, as a matter of law, to the extent FCA proves liability on any of its claims, FCA's damages should not exceed $5,000 per railcar less the actual cost of material per railcar.[5]

**B.     FCA Cannot Recover Damages In Excess Of Repair Costs Permitted Under Warranty**

Despite FCA expressly agreeing to limit available remedies under the Warranty, FCA seeks damages in excess of the Warranty including damages for: (1) repairs, (2) transporting the railcars for repairs, (3) out-of-pocket costs related to determining how to repair the railcars, (4) attorneys' fees, and (5) treble damages under the Illinois Consumer Fraud Act. According to FCA, FCA incurred $3,154,278.92 for repair and transportation costs. FCA has not demonstrated amounts incurred for the other categories of damages sought in its Complaint.

The evidence is undisputed that FCA voluntarily incurred additional costs in an attempt to maintain its relationship with Mitsui. In its Master Railcar Manufacturing and Purchase Agreement with Mitsui, as it related to the component parts (such as the coating used), FCA only agreed to pass on to Mitsui the manufacturer's warranty for each component part of any railcar it manufactures for Mitsui. (SOF ¶ 26.)[6] After FCA was informed by Mitsui of blistering of the paint and other alleged cosmetic defects on the railcars, FCA considered several repair options without input from Davis-Frost. First, FCA attempted to cure the cars for additional time. (SOF ¶ 24.) Second, FCA planned to remove the paint from the affected areas, by sanding the railcars, and

---

[5] The Warranty does not define the term "railcar." FCA agreed to build 100 railcars for Mitsui, but each railcar is in fact three separate units. Therefore, the Warranty language is ambiguous as to whether the $5,000 less materials applies to the 100 railcars or 300 units. Regardless, the damages sought by FCA exceed either the $500,000 limitation or $1.5 million limitation.

[6] To clarify, Johnstown America Corporation is now known as FreightCar America, the Plaintiff in this matter. (Tonn Dep. 107:7-19, Dec. Ex. V.)

partially repaint the railcars at its facility, which the costs associated with this option was estimated at $1,159.611. (SOF ¶ 25.) Third, FCA eventually succumbed to Mitsui's demands and agreed to send the railcars to a third party to be blasted and completely repainted, at what FCA alleges was an ultimate cost of $3,154,278.92. (SOF ¶ 28.)

The record demonstrates that FCA ignored the terms of the Warranty in an attempt to preserve its relationship with Mitsui when it agreed to option 3, in a letter dated June 11, 2020 from Mitsui's President to FCA's Chief Commercial Officer and President. (SOF ¶ 28.) In fact, Mitsui and FCA agreed that the warranty provided in Section 9 of their Master Railcar Manufacturing and Purchase Agreement that all FCA was providing was the pass-through warranty remained in full force and effect. (SOF ¶ 26.) Thus, at the time Mitsui and FCA agreed to Mitsui's preferred repair, both parties understood their agreement exceeded the repair and damage limitations set forth in the Warranty.

Other terms outlined in the June, 2020, letter demonstrate FCA's intent to preserve its relationship with Mitsui at any cost. (SOF ¶ 28.) FCA and Mitsui agreed that Mitsui will receive 20% of the proceeds, net of the attorneys' fees and costs, in any legal action against Davis-Frost. (*Id*.) FCA also agreed to provide a meaningful discount to Mitsui on any future railcar build. (*Id*.)

The evidence is undisputed that FCA was willing to set aside any limitations on reimbursement of repair costs in order to appease Mitsui with the intent to saddle Davis-Frost with the excess costs incurred. (SOF ¶ 28.) And this Court cannot ignore the clear and unambiguous language preventing FCA from recovering more than the agreed upon limitation—*i.e.,* $5,000 for repairs less material per railcar. Accordingly, Davis-Frost seeks a ruling from this Court determining FCA's alleged damages as matter of law may not exceed the Warranty limitations.

### C.    FCA's Failure to Mitigate Damages Further Limits FCA's Recovery

Davis-Frost's affirmative defense of the doctrine of mitigation of damages further bars FCA's attempt to seek damages on its claims against Davis-Frost in excess of $1,159.611. FCA's breach of express and implied warranty claims, breach of contract claim, and consumer fraud claim are all based on identical facts: FCA purportedly was damaged in the amount of $4 million for costs associated with re-painting the railcars due to Davis-Frost's allegedly defective paint. It is undisputed FCA ignored the processes in the Warranty and the limitation of damages, and instead entered into an agreement with Mitsui whereby it agreed to send the railcars to a third party incurring the amount of $3,154,278.92.[7] Yet, it is also undisputed FCA determined an alternative, viable option to remedy the situation: FCA would sand and re-paint the railcars for the amount of $1,159.611.

Under Virginia law, FCA had a duty to mitigate its damages.[8] *Middle E. Broad. Networks, Inc. v. MBI Glob., LLC*, 689 F. App'x 155, 162 (4th Cir. 2017). Because this doctrine is an affirmative defense, Davis-Frost bears the burden of proving FCA failed to mitigate its damages. *Id.* Considering the undisputed facts, Davis-Frost can demonstrate FCA failed to take "ordinary efforts and reasonable expenditure to minimize consequential damages" by voluntarily choosing to incur more than necessary to repair the railcars. *Id.*

As discussed above, FCA considered multiple repair options. First, in February 2020, FCA considered curing the cars for additional time and reported test results that were "acceptable per FCA and Davis-Frost standards and guidelines." In fact, FCA noted that "A complete review of

---

[7] FCA has not separately provided an explanation or evidentiary support for the remaining $850,000.00 damages sought. For that independent basis, this Court should ignore these speculative damages. Indeed, Davis-Frost sent both an interrogatory seeking a full description of damages and examined the designated 30(b)(6) damages witness and on no occasion has FCA quantified damages except for the repair and freight costs.

[8] Likewise, under Illinois law, a non-breaching party's recoverable damages may be reduced if the party could have reasonably avoided the amount of loss by "making substitute arrangements." *Ner Tamid Congregation of N. Town v. Krivoruchko*, 638 F. Supp. 2d 913, 919–20 (N.D. Ill. 2009), as amended (July 9, 2009)

the re-bake process was completed along with Bob Iezzie's analysis supporting the necessity to 'force cure' the paint and that once cured the paint should perform at prescribed levels." Ultimately, FCA planned to remove the paint from the affected areas, sand the railcars, and repaint the railcars at its facility at a cost between $1,134,197 and $1,159,611. Jim Meyer, FCA's President, to Mitsui's President, pitched the plan to Mitsui emphasizing that once cured, "the physical properties of hardness and adhesion appear excellent," and that this is "the conclusions of Dr. Iezzi and supported by test results" and, notably, that "whether the paint finish is smooth or blistered as observed on the cars in Georgia, the adhesion qualities are excellent." FCA presented a detailed repair plan that included drying / sanding and partial repainting that FCA hoped Mitsui would accept. Despite the existence of a detailed plan, with positive test results, Mitsui demanded that FCA remove all of the paint and repaint the railcars. (SOF ¶¶ 25, 27-28). Instead of proceeding with this repair option, FCA and Mitsui agreed to utilize third-parties to strip and repaint all the railcars at an expense of more than $3,000,000.

In sum, FCA had the option to seek Davis-Frost to repair the railcars at the cost not to exceed $5,000 a railcar or to seek reimbursement from Davis-Frost up to $5,000 less the amount of materials per rail car for its own repairs. Knowing these options and limitations, FCA voluntarily agreed to incur more than $3.1 million despite having a potentially far less expensive option and seeking reimbursement up to the Warranty limitation from Davis-Frost. Accordingly, because FCA determined it could repair the railcars for the amount of $1,159,611, FCA cannot seek additional expenses on any of its claims over this amount—expenses that were incurred solely to salvage its relationship with Mitsui.

## IV.  FCA CANNOT RECOVER UNDER THE ICFA

Based on the identical set of facts to support its breach of warranty and contract claims, in Count V, FCA alleges that Davis-Frost violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA" or the "Act") based on certain purported misrepresentations and omissions made to FCA at the time of the Purchase Orders and execution of the Warranty. The ICFA is designed to protect consumers against "fraud, unfair methods of competition, and other unfair and deceptive business practices." *Sanchez v. Am. Exp. Travel Related Servs. Co., Inc.*, 865 N.E.2d 410, 416 (Ill. App. Ct. 2007). FCA cannot demonstrate through allegations or evidence that Davis-Frost's representations made vis-à-vis the Warranty are "deceptive acts" aimed at consumers or impacted consumers. As demonstrated below, this Court should grant summary judgment in favor or Davis-Frost because (1) the choice of law provision bars an action under the ICFA; (2) FCA does not have standing to bring this claim; (3) FCA's consumer fraud claim is not actionable because it is based on identical allegations that Davis-Frost breached its obligations under the Purchase Orders and Warranty; and (4) FCA has not (and cannot) offer admissible evidence to support its allegations to prove any deceptive acts committed by Davis-Frost.

### A. Virginia Law Bars The ICFA Claim

As addressed in Section I, Virginia law should govern the ICFA claim. In cases, where a different state law is applicable, courts have dismissed claims under the ICFA. *See Kronos Prod., Inc. v. Sasib Bakery N. Am., Inc*., No. 00 C 670, 2002 WL 1308637, at *5 (N.D. Ill. June 14, 2002) (dismissing ICFA claim based on a valid choice of law provision applying Texas law) (citing other Illinois cases); *Smith v. Fifth Third Bank*, No. 1:18-CV-464, 2019 WL 1746367, at *12 (S.D. Ohio Apr. 18, 2019), *report and recommendation adopted*, No. 1:18-CV-464, 2019 WL 4050946 (S.D. Ohio Aug. 28, 2019) (same with provision applying Ohio law).

Here, because FCA's breach of warranty claim is predicated on identical facts supporting the ICFA claim, this Court—in applying Virginia law—should find that the ICFA claim is barred. *See, e.g., Smith*, 2019 WL 1746367, at *12 (finding "the ICFA 'misrepresentation' claims to be so closely related to the breach of contract claims that the Ohio choice-of-law provision should be applied.")

**B.      FCA Is Not A Consumer And Cannot Show A Nexus To Consumer Protection**

As a matter of law, FCA does not have standing to bring a claim pursuant to ICFA because FCA is not a "consumer" and cannot satisfy the "consumer nexus" test under the Act. It is well established under Illinois law that "[m]erely purchasing component parts for incorporation into a final product does not make a party a consumer." *See Ivanhoe Fin., Inc. v. Mortg. Essentials, Inc.*, 2004 WL 856591, at *2 (N.D.Ill. Apr. 21, 2004); *see also Tile Unlimited, Inc. v. Blanke Corp*., 788 F. Supp. 2d 734, 739 (N.D. Ill. 2011). Therefore, in order to have standing under ICFA, FCA must demonstrate "a nexus between the complained of conduct and consumer protection concerns." *Community Bank of Trenton v. Schnuck Markets, Inc*., 887 F.3d 803, 822–23 (7th Cir. 2018). To meet such burden, FCA is required to plead Davis-Frost has engaged in "conduct that is either directed toward the market or otherwise implicates consumer protection concerns." *Tile Unlimited*, 788 F. Supp. 2d at 739 (internal citation omitted). FCA has failed to do so. Indeed, FCA's allegations focus on the representations made ***to FCA*** and not the market generally. For example, FCA alleges "[i]n the course of marketing and selling its water-based 'WATER-TUFF' paint line ***to FCA***, Davis-Frost represented ***to FCA*** that the Mineral Brown Paint was appropriate industrial coating to apply to steel railcars…." (Compl. ¶ 83) (emphasis added).

Further, FCA has failed to allege how Davis-Frost representations made to FCA in relation to its transaction ultimately implicates consumer protections, nor can it. The fact that a "consumer"

may ultimately be impacted by Davis-Frost paint, does not bring the claims within the ambit of the ICFA. Courts have consistently rejected vague allegations of implications of consumer protection. *See Kingsford Fastener, Inc. v. Koki*, 2002 WL 992610, at *3 (N.D. Ill. May 15, 2002) (A consumer nexus is not established, however, simply because consumers are the ultimate users of the products at issue). Because FCA has not and cannot properly plead a claim under ICFA, this Court should grant judgment in favor or Davis-Frost on Count V.

### C.     FCA's ICFA Claim Is Redundant Of Its Warranty and Contract Claims

Separately—even if this Court finds FCA has standing—this Court should enter judgment in favor of Davis-Frost on the ICFA claim because it merely mirrors FCA's breach of warranty and breach of contract claims. It is well-established that a breach of contractual promise, without more, is not actionable under ICFA. *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 169 (2005). As the Illinois Supreme Court reasoned, "[w]ere our courts to accept plaintiff's assertion that promises that go unfulfilled are actionable under the Consumer Fraud Act, consumer plaintiffs could convert any suit for breach of contract into a consumer fraud action." *Id.*

Here, FCA's breach of contract claim (Count I) and breach of warranty claim (Count IV) are entirely based on the language that Davis-Frost expressly warranted all material "will be free from defect" and despite this language, the Mineral Brown Paint was allegedly defective in that it was subject to blistering when used on the steel railcars. (*See* Compl. ¶¶ 48-53, 73-77.) Likewise, FCA, in support of its consumer fraud claim, alleges that Davis-Frost knew or should have known the Mineral Brown Paint would fail to adhere to railcars due in part of the improper and defective formulation. (Compl. ¶ 84.) In an attempt to distinguish this claim from the breach of warranty and contract claims, FCA alleges the above-described misrepresentations and/or omissions made by Davis-Frost in its marketing of the product to FCA. However, these alleged representations and omissions were all made in connection with the marketing and selling of the paint ***to FCA***, which

is governed by the Purchase Order and Warranty. Moreover, FCA seeks identical damages associated with its claims thereby further reinforcing the fact this claim is redundant. As such, as a matter of law, this Court should grant judgment in favor of Davis-Frost. *See Della Parola Cap. Mgmt., LLC v. Blaze Portfolio Sys.*, LLC, No. 21 CV 321, 2021 WL 3674613, at *5 (N.D. Ill. Aug. 19, 2021) (in granting dismissal of the ICFA claim, the district court found plaintiff's allegations of fraudulent representations and omissions about the software's defect "were all made in the course of a contractual relationship" and plaintiff's contract and fraud claims rested on identical facts: "an agreement to provide software that went awry.")

### D. FCA Cannot Proffer Admissible Evidence To Support An ICFA Claim

Even if FCA could state an ICFA claim (which it cannot), FCA has failed to elicit or produce any admissible evidence that establishes Davis-Frost violated ICFA. In order to prevail on a claim under the Act, FCA must show that Davis-Frost committed a "deceptive act or practice." *Selby v. Thomson Corp.*, 371 Ill.App.3d 556, 559, 862 N.E.2d 1006, 1008-09 (2006), which FCA cannot do so. FCA alleges the following "deceptive acts" in its Complaint:

- Representing to FCA that Mineral Brown paint was an appropriate industrial coating to apply to steel railcars and that the paint would "adhere to and protect steel railcars from corrosive failure of the steel substrate for up to one decade." (Compl. ¶ 83.)

- Representing that its water-based paint products such as the Mineral Brown Paint had performed well on railcars when, in fact, Davis-Frost knew that paint failures had occurred. (Compl. ¶ 91.)

- Failing to disclose to FCA the existence of paint failures suffered by other railcar manufacturers, including failures of the Mineral Brown Paint. (Compl. ¶ 91.)

- Failing to disclose to FCA that Davis-Frost knew based on its own lab evaluations that the Mineral Brown Paint was improperly formulated and was prone to blistering and other failures when applied to steel railcars, such as the Railcars. (Compl. ¶ 91.)

As an initial matter, Rule 9(b) applies to deceptive claims stated under the ICFA, requiring FCA to allege "who, what, when, where, and how" in order to demonstrate the alleged fraud with particularity. *Totty v. Anderson Funeral Home*, Ltd., 448 F. Supp. 3d 928, 937 (N.D. Ill. 2020); *see also Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019) (finding Rule 9(b) applies to claims based on deceptive conduct thereby requiring the plaintiff to plead with particularity). Other than those statements contained in the Warranty and related Davis-Frost documents, FCA has not identified any specific statements made by an individual from Davis-Frost at the time it was marketing the product to FCA. Rather, FCA vaguely asserts "Davis-Frost" represented without any details. Because FCA is required to identify who, what, when, where and how when alleging a misrepresentation under ICFA and has not done so, this Court should dismiss the ICFA claim with respect to the misrepresentations identified above.[9]

Regarding the omissions identified by FCA, these relate to the notion that the Mineral Brown paint was defectively formulated, and Davis-Frost knew that this paint was defective when it sold it. The undisputed evidence, however, does not support these purported omissions. In fact, FCA has applied the Mineral Brown paint successfully on railcars for years and had knowledge that blistering could occur from over application. (SOF ¶ 9, 29-31.) For example, during a 2018 build, Davis-Frost Water Tuff black paint applied by FCA blistered. (SOF ¶ 31.) The parties could not come to any agreement as to the root cause and agreed to split some costs associated with railcar repair. (*Id.*) FCA conceded it was in possession or had access to, Davis-Frost's Product Data Sheet and Paint Repair Procedure, both of which provided warnings that misapplication could cause the paint to blister in the field. (SOF ¶¶ 5-7.) Thus, the evidence demonstrates not only did FCA have first-hand knowledge that the paint could blister in certain situations and environments,

---

[9] And as discussed above, any statements contained in the Purchase Orders, Warranty or related documents are merely promises FCA claims were breached and therefore cannot form a basis for an ICFA claim.

but also Davis-Frost provided direct written warnings to FCA regarding the potential for blistering. As such, FCA's claim that Davis-Frost made misrepresentations and/or omissions regarding the paint at issue is completely without merit.

FCA further relies on a lawsuit from the early 2000s in which Davis-Frost was sued by a railcar manufacturer, Gunderson, Inc., when blistering appeared on railcars it had painted with Davis-Frost paint. FCA's reliance on Gunderson is misplaced because the case concerned an entirely different paint. (Henning Dep. 17:16-20, Ex. HH.) In fact, the Mineral Brown paint had not even been formulated at the time of the lawsuit. (Henning Dep. 18:17-25, 19:1-6, Dec. Ex. HH.) And, after the Gunderson lawsuit, Davis-Frost reformulated the Water-Tuff family of paints to address the formulation concerns at issue in the lawsuit. (Henning Dep. 17:21-18:16; 20:25-21:15, Dec. Ex. HH.) The Mineral Brown paint at issue in the present matter is formulated from the reformulated Water-Tuff paint and therefore Gunderson has no bearing on the issues in this matter. (Henning Dep. 22:17-21, Dec. Ex. HH.) Because FCA cannot show that Davis-Frost committed a deceptive act or practice as required by the Act, summary judgment is warranted in Davis-Frost's favor.

## CONCLUSION

For the reasons stated herein, Davis-Frost respectfully requests the Court grant summary judgment in its favor and against Plaintiff on Counts I through V and for such further relief this Court deems just and proper.

Respectfully submitted,

Dated: May 11, 2022                    **LATHROP GPM LLP**

By:    s/ Charles K. Maier
Justin L. Sallis (VSB No. 82599)
Charles K. Maier (PHV – MN Atty. #230315)
Kristin Stock (PHV – MN Atty. #0400820)
LATHROP GPM LLP
The Watergate – Suite 700
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
Phone: (202) 295-2200
Fax: (202) 295-2250
justin.sallis@lathropgpm.com
charles.maier@lathropgpm.com
kristin.stock@lathropgpm.com

**ATTORNEYS FOR DEFENDANT
DAVIS-FROST, INC.**

**CERTIFICATE OF SERVICE**

I, Charles K. Maier, hereby certify that on May 11, 2022, I electronically filed the foregoing Memorandum of Law in Support of Motion for Summary Judgement (unredacted version) with the Clerk of the Court using the CM/ECF system which sends notification of this filing to all counsel of record.


Dated:  May 11, 2022                    *s/Charles K. Maier*
                                        Charles K. Maier, Attorney for Defendant