# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
# LYNCHBURG DIVISION

| | |
|---|---|
| FREIGHTCAR AMERICA, INC., a Delaware Corporation, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 6:21-cv-00027-NKM ) |
| DAVIS-FROST, INC., a Minnesota Corporation, | ) ) ) |
| Defendant. | ) ) |

## DEFENDANT DAVIS-FROST, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Davis-Frost requests that this Court rule as a matter of law that (1) FCA's overapplication of the paint prevents it from recovery on any of its claims; (2) that if FCA is entitled to proceed to trial damages are limited to the parameters agreed to in the Warranty; (3) FCA's Illinois Consumer Fraud and Deceptive Trade Practices Act claim fails; and (4) FCA failed to mitigate its damages thereby prohibiting, in whole or in part, the recovery it seeks. This Court may do so because the *material* facts related to this Motion are not in dispute. Importantly, the parties do not dispute that the Warranty applies to FCA's purchase and application of the paint to the railcars or that it was in place two years before FCA issued its purchase orders. (Compl. ¶ 72 ("The Express Warranty is applicable to FCA's purchase and use of the Mineral Brown Paint on the Railcars"; ¶ 15 "Prior to accepting FCA's Contract, Davis-Frost agreed to provide FCA with a certain Protective Coatings New Railcar Warranty."))

FCA attempts to avoid summary judgment by reciting facts that are disconnected from the motion (in large part because they relate to actions after the sale and alleged failure of the paint)

and that mischaracterize the record. For example, FCA attempts to portray Davis-Frost as "lying" to FCA because it did not describe the paint's past performance (even though FCA had its own prior experience with blistering paint) and by not revealing test results that were not conducted until after FCA misapplied the paint to the subject railcars. But Davis-Frost's testing conducted after the build is not relevant to FCA's misapplication of the paint or any representations or warranties that Davis-Frost allegedly made to FCA before FCA purchased the paint. FCA seeks to overwhelm the Court with unnecessary details that distract from the issues material to this Motion: that the parties agreed to a limited Warranty that predates the Purchase Order and the Warranty is applicable to FCA's purchase and use of the subject paint. Accordingly, for the reasons stated herein, summary judgment dismissing FCA's claims is appropriate.

## ARGUMENT

**I.   THE COURT SHOULD APPLY VIRGINIA LAW TO FCA'S CLAIMS**

As Davis-Frost anticipated, FCA requests that this Court apply both Virginia and Illinois law to the question of whether Davis-Frost breached its obligations to FCA. (Resp. Br. at 17.)[1] While FCA does not dispute that the Warranty applies to its purchase and use of the subject paint, (Compl. ¶ 72), it does claim that the choice-of-law provision in the Warranty does not apply to its claim for breach of contract under the Purchase Order.  FCA is incorrect.

FCA relies on two Virginia cases for its position that Virginia law applies only to claims related to the Warranty. First, *Cortez-Melton v. Capital One Financial Corp.*, 2021 WL 771754, at *7 (E.D. Va. Feb. 26, 2021), does not stand for FCA's cited proposition. (*See* Resp. Br. at 17.) In fact, the interpretation of a choice-of-law provision is not even at issue in the case.

---

[1] Davis-Frost will cite to FCA's Response Brief as "Resp. Br."

2
48874244v5

Similarly, *Hussain v. ImpactOffice, LLC*, 94 Va. Cir. 443 (Va. Cir. Ct. Oct. 31, 2016), does not advance FCA's position. FCA relies on this case for the proposition that "plain language of narrow choice-of-law provision limited its application to claims for breach of that agreement *only*." (Resp. Br. at 17.) But FCA ignores the very narrow language of the provision: "All suits, proceedings and other actions relating to . . . *this* Agreement. . . ." *Hussain*, 94 Va. Cir. at *3. The Court interpreted that language to mean that the forum-selection clause applied to any claims under the Non-Solicitation Agreement but did not apply to claims related to the other three agreements.

Here, the plain language of the pertinent provision is unambiguously broad encompassing "all rights and obligations" under the Agreement and "any action . . . in connection with this warranty or the breach thereof." Therefore, unlike in *Hussain*, undeniably FCA's claims fall within this expansive language because as the Complaint and the record make evident each claim is related to Davis-Frost's alleged breach of the Warranty for Mineral Brown paint.

FCA's argument that its breach of contract claim is not related to the Warranty is tortured. Each of FCA's claims are based upon the same underlying facts and conduct, all of which concern the paint's performance and FCA's application of the paint. Each of FCA's claims are directly connected to and based upon the Warranty or the breach thereof, and FCA does not dispute that the Warranty applies to its purchase and use of the paint. (Compl. ¶ 72.) Given the broad unambiguous language in the Warranty and the fact that FCA's claims are all connected to the Warranty, this Court should enforce the choice-of-law provision and apply Virginia law to all FCA's claims.

II.  **FCA CAUSED THE ALLEGED DEFECTS THROUGH IMPROPER PAINT APPLICATION**

FCA spends little time refuting the numerous facts demonstrating that FCA misapplied the paint contrary to Davis-Frost's instructions. (Resp. Br. at 16.) FCA agrees with Davis-Frost that it

3

48874244v5

applied the subject paint in excess of Davis-Frost's written requirements. (Resp. Br. at 5.) FCA claims that Greg Carmichael, Davis-Frost's salesman, approved the overapplication. (*Id.*) FCA's memorandum omits the fact that its own paint maps had numerous dry film thickness readings above 8 mils and that some railcars were painted under improper environmental conditions. (DF's SOF ¶¶ 14-16.) FCA did not cite record evidence to rebut that its own documentation shows that it used 1,456 more gallons of paint than what was called for in the build's bill of materials. (DF's SOF ¶ 15.) Davis-Frost not only warned FCA that misapplication contrary to its instructions could lead to blistering in the field, FCA had its own experience with blistering in 2018. There is no genuine dispute of material fact that FCA overapplied the paint and therefore its admitted misapplication dooms its warranty claims, express and implied.

### III. THE WARRANTY LIMITS FCA'S POTENTIAL DAMAGES ON COUNTS I THROUGH IV

#### A. The Warranty Limits FCA's Potential Damages in Count I

Based on identical set of facts, FCA seeks recovery for damages related to alleged defective Mineral Brown paint under two separate documents. (*See generally* Counts I and IV.) Accordingly, in its summary judgment motion, Davis-Frost seeks a determination—as a matter of law—that FCA's available remedies (to the extent FCA can demonstrate a breach) are limited by the damages limitation in the 2017 Warranty. The Warranty expressly provides that the Product shall be free of all defects and "[a]s to each railcar that receives the Product application…the Warranty shall commence on the date the Railcar is delivered…and [f]or each Railcar, the Warranty will terminate 120 months from the Commencement Date (the 'Warranty Period') for New Car applications." (DF's SOF ¶ 2; Compl. Ex. B.) It is further undisputed that the Purchase Order was tendered after the parties entered into the Warranty and the parties intended for "FCA's purchase and use of the Mineral Brown Paint on the Railcars"—as reflected in the Purchase

4

Order—to be subject to the Warranty. (*See* Compl. ¶ 72; DF's SOF ¶¶ 1, 3.) Moreover, paragraph 2.01 of the Warranty provides a limitation on damages:

> Upon notification from FreightCar in accordance with Section 4 hereof, the Company will, at FreightCar's sole discretion, either (i) proceed to repair any and all Defects in the Product, all at the Company's sole cost and expense **not to exceed $5,000 per railcar** utilizing repair facilities mutually agreed upon by the Company and FreightCar, or (ii) provide FreightCar with the replacement coating materials as may be necessary to repair the Defects in accordance with this Warranty and will reimburse FreightCar for all reasonable costs associated with the application thereof **not to exceed $5,000 less the actual cost of material per railcar**.

(Compl. Ex. B; Dep. Ex. 169, Maier 5/11/22 Dec. [Doc. 60-1] Ex. A ¶ 2.01.)

Despite the clear and unambiguous language of the Warranty demonstrating the parties' intent to limit FCA's remedies for *any* paint purchased by FCA that was subject to the ten-year warranty, FCA argues, in Count I (breach of Purchase Order), it is entitled to *also* seek remedies under Paragraph 4 of the Purchase Order. This argument is not supported by the facts or the law.

First, FCA contends that when it issued the Purchase Order, Davis-Frost "accepted those new terms by shipping the paint and accepting payment." (Resp. Br. at 17.) FCA's reliance on the Illinois Uniform Commercial Code, 810 ILCS 5/2-207[2] is misplaced because the statute specifically provides that additional terms in which materially alter the contract do not become part of the contract. Here, to extent that FCA argues that the indemnification language in Paragraph 4 of the Purchase Order eliminates the $5,000 per car damages cap, it is an additional term that materially alters the contract—the Warranty—and therefore that term does not become part of the contract.

Second, FCA argues because the Warranty did not disclaim all other warranties, FCA may seek additional remedies provided under the Purchase Order. FCA's arguments ignore the

---

[2] As discussed in Section I, Virginia law should apply to this dispute. Virginia has adopted the identical provision. *See* Va. Code § 8.2-207.

unambiguous language of the Warranty that specifically provides "[n]o alterations or modifications of this Warranty shall have any force or effect unless agreed upon in writing and signed by duly authorized representatives of FreightCar and the Company." (*See* Compl. at Ex. B.) Courts must look to "the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." *Bolton v. McKinney*, 855 S.E.2d 853, 855 (Va. 2021). The Purchase Order was issued after the parties had agreed to the Warranty, and there is no evidence that Davis-Frost signed a modification to the Warranty that would eliminate the agreed upon $5,000 per car damages cap. Accordingly, considering the undisputed material facts and the parties' intentions demonstrated by the plain language of the Warranty, the Court may find, as a matter of law, the Purchase Order's ***new terms*** did not alter or modify the agreed upon limited Warranty.

Additionally, FCA's reliance on *Hunter Tech. Corp. v. Omega Glob. Techs., Inc.*, 505 F.Supp.3d 802 (N.D. Ill. 2020) is unavailing. The legal question addressed by the court in *Hunter* was whether under Illinois law partial performance pursuant to buyer's purchase order constituted an acceptance of the contract terms by the seller despite the fact the seller *subsequently* issued an invoice with contradictory terms. Unlike in *Hunter*, the governing document—the Warranty—was entered into by the parties prior to the Purchase Order. And the evidence demonstrates the parties conducted business together pursuant to the terms of the Warranty for *over two years* before FCA issued the Purchase Order. Certainly, if FCA—a sophisticated party—wanted to materially alter the $5,000 per car damages cap, it could have done so with a writing signed by both parties, which it did not obtain.

FCA also argues that the Warranty failed of its essential purpose to provide repairs or pay for repairs should the paint exhibit defects as described in the Warranty. (Resp. Br. at 21.) The

6

evidence is undisputed: Davis-Frost was not asked to participate in the repair process; FCA and Mitsui determined—without Davis-Frost's input—that they would proceed with an expensive repair process; and FCA would shoulder the cost of a majority of the repair process. (DF's SOF ¶¶ 23-28.) Any alleged failure of the Warranty's essential purpose was caused by FCA's own actions and therefore FCA is barred from seeking damages above and beyond the limitations in the Warranty.

Therefore, FCA's available remedies for breach of the Protective Order (Count I) should be limited to those expressly set forth in the Warranty.[3]

**B. FCA's Implied Warranty Remedies Are Also Limited By the Warranty**

Contrary to FCA's contention, the Warranty does limit its available remedies for the implied warranty of merchantability. Under Va. Code § 8.2-317, express and implied warranties "shall be construed as consistent with each other and as cumulative, but if such construction is unreasonable the intention of the parties shall determine which warranty is dominant. In ascertaining that intention, the following rules apply . . . (c) Express warranties displace inconsistent implied warranties other than an implied warranty of fitness for a particular purpose." Accordingly, the implied warranties should be interpreted consistently with the Warranty, meaning that they are subject to the cap on the damages amount per railcar and the limitations precluding FCA from seeking indirect, consequential, or incidental damages. (Compl. Ex. B at ¶¶ 2.01, 3).

Additionally, § 8.2-316 and § 8.2-719 permit Davis-Frost to limit or modify available remedies for implied warranties. Specifically, § 8.2-316 provides that "[r]emedies for breach of warranty can be limited in accordance with the provisions of this title on liquidation or limitation of damages and on contractual modification of remedy (§§ 8.2-718 and 8.2-719)." Section 8.2-719

---

[3] FCA concedes the limitations of the Warranty apply to Count IV. (Resp. Br. at 19, "the 2017 Warranty damages limitation applies only to Count IV based on breach of the representations in that 2017 Warranty.")

7

provides that "the agreement may provide for remedies in addition to or in substitution for those provided in this title and may limit or alter the measure of damages recoverable under this title, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts[.]"

Reading these provisions together, the Warranty limitations related to the repair process and damages amount should govern any potential damages related to the implied warranties. (Compl. Ex. B. at ¶ 2.01). The Warranty provision barring FCA from pursuing indirect, consequential, or incidental damages also applies to this claim. *See* Va. Code § 8.2-719(3) ("Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.")

### C. The Warranty Limits All Damages

FCA makes the convoluted argument that the Warranty *only* limits FCA from recovering indirect, consequential and incidental damages, but not direct damages. (Resp. Br. at 22.) Direct damages "are those which arise 'naturally' or 'ordinarily' from a breach of contract; they are damages which, in the ordinary course of human experience, can be expected to result from a breach." *William H. Gordon Assocs., Inc. v. Heritage Fellowship, United Church of Christ*, 784 S.E.2d 265, 279 (Va. 2016) (citation omitted). Here, FCA's direct damages would be the costs "incurred to remedy the defective paint on the Railcars." (*See, e.g.,* Compl. ¶ 77.) And the Warranty expressly limits FCA's costs and expenses for repairs not to exceed $5,000 per railcar. (Compl. Ex. B.) Therefore, the Warranty provides both a limitation on the direct damages ($5,000 cap per railcar) *and* excludes all indirect, consequential and incidental damages. (Maier 5/11/22

Dec. [Doc. 60-1] Ex. A, ¶ 3(c) (Davis-Frost "shall have no obligations to FreightCar with respect to: . . . c) All indirect, consequential and/or incidental damages, losses and expenses howsoever caused and of whatsoever nature.")) Essentially, FCA's interpretation of the Warranty—*i.e.,* the Warranty does not bar "direct damages"—would make the $5,000 per car limitation on repairs meaningless. Because courts presume the parties "have not used words needlessly," the only reasonable interpretation is the Warranty expressly limits direct damages. *Cortez-Melton*, 2021 WL 771754 at *7.

**IV.  FCA CANNOT ESTABLISH A CLAIM UNDER THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT**

Davis-Frost advanced four bases for dismissal of FCA's Illinois Consumer Fraud Act ("ICFA") claim: (1) Virginia law bars the ICFA claim; (2) FCA is not a consumer; (3) the ICFA claim is redundant of the breach of contract and warranty claims; and (4) FCA failed to plead with specificity misrepresentations and demonstrate same with admissible evidence.  As an initial matter, FCA's failure to respond to Davis-Frost's third and fourth arguments raised in its summary judgment results in waiver. *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1078 (7th Cir. 2016); *Jimoh v. Charlotte-Mecklenburg Hous. P'ship, Inc.*, No. 3:08-CV-495-RJC-DCK, 2010 WL 1924480, at *3 (W.D.N.C. May 12, 2010), *aff'd*, 428 F. App'x 241 (4th Cir. 2011) (against defendant's "well-reasoned arguments for summary judgment, the plaintiff's failure to respond amounts to an effective waiver of these claims").  Regarding the first argument, in Section I, Davis-Frost demonstrates Virginia law is applicable based on the broad language of the Warranty and therefore FCA is barred from asserting a claim under an Illinois statute. (*See* Mot. at Sect. IV, A.)  As such, for any one of these reasons, this Court may enter judgment in favor of Davis-Frost on the ICFA claim.

9
48874244v5

Separately, FCA—as a matter of law—cannot plead it is a consumer under ICFA. FCA first erroneously argues that the ICFA states "any person" may bring a claim and that the definition "any person" includes corporations. (Resp. Br. at 24.) This argument, however, ignores the statutory language that defines "consumer" as any person who purchases or contracts for the purchase of ***merchandise not for resale in the ordinary course of his trade or business*** but for his use or that of a member of his household. And Illinois courts have consistently held a plaintiff must demonstrate standing by pleading and proving it is a "consumer." *Steinberg v. Chicago Medical School*, 69 Ill.2d 320, 328, 13 Ill.Dec. 699, 371 N.E.2d 634 (1977) (noting that the Consumer Fraud Act protects "consumers and borrowers and businessmen against fraud, unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce").

FCA then incredibly argues it is a "consumer" under Illinois law because it purchased paint for its ***own*** railcars and for use in manufacturing railcars for others. (Resp. Br. at 24). In support of this argument, FCA cites to a single case, *Lefebvre Intergraphics, Inc. v. Sanden Mach. Ltd.*, 946 F.Supp. 1358 (N.D. Ill. 1996). In *Lefebvre*, the plaintiff, a commercial printer, was held to be a "consumer" because it had purchased a printing press from the defendant for its own use. The Court reasoned the press was not used "for resale in the ordinary course of his trade or business." 946 F.Supp. at 1369.

*Lefebvre* is inapposite. The plaintiff in *Lefebvre* purchased a printing press for its own use, and used the printing press to create products for sale that were entirely separate from the printing press; that is, the press was not a component part to another product. Indeed, courts have recognized *Liefebvre's* limited application. *See, e.g.*, *Tile Unlimited, Inc. v. Blanke Corp.*, 788 F. Supp. 2d 734, 739 (N.D. Ill. 2011). In *Tile Unlimited*, Tile Unlimited purchased the Uni-Mat Pro

10

from defendant as an inseparable component of the final tile product that Tile Unlimited installed at homes and businesses. Tile Unlimited did not use it to produce wholly separate products for the market—like the *Lefebvre* plaintiff did with the printer press. Accordingly, the district court held Tile Unlimited is not a "consumer" under the ICFA as it related to its purchase of Uni–Mat Pro.

Likewise, FCA cannot demonstrate it is a consumer under ICFA. FCA's characterization that it purchased paint for its own use is "inaccurate and flatly at odds with the complaint" and the evidence. FCA specifically alleged that it purchased Davis-Frost Mineral Brown paint for the railcars it promised to manufacture and delivery to its longtime customer. (Compl. ¶¶ 7-10.) Because it is undisputed FCA purchased the Mineral Brown paint as a component part for incorporation into the railcars to be sold to a third party FCA—as a matter of law—cannot be deemed a consumer. *See, e.g., Ivanhoe Fin., Inc. v. Mortg. Essentials, Inc.,* 2004 WL 856591, at *2 (N.D. Ill. Apr. 21, 2004); *Pressalite Corp. v. Matsushita Elec. Corp. of Am.*, 2003 WL 1811530, at *10 (N.D. Ill. Apr. 4, 2003) ("The fact that [plaintiff] purchased component parts from [defendant] does not render it a consumer under the Act.").

Finally, FCA attempts to prove standing under the consumer nexus test by vaguely asserting the paint sold by Davis-Frost "implicated public environmental safety concerns, as described by Mitsui." (Resp. Br. at 24, citing to ¶ 10). FCA's citation only references assurances Davis-Frost purportedly made to Mitsui regarding the durability and integrity of the paint to protect against corrosion and to limit environmental risks. (Resp. Br. at 6.) These assurances were made to Mitsui, not to the market and therefore do not provide FCA with standing, as required under Illinois law. And, notably, these "assurances" are not even the alleged misrepresentations made to FCA, which form the basis of FCA's consumer fraud claim. FCA's single, vague allegation regarding the impact on the public does not suffice to state a claim under the ICFA. *See Harris v.*

11

*JAT Trucking of Ill., Inc.*, 2009 WL 2222740, at *9 (C.D. Ill. July 24, 2009) (finding the consumer nexus test was not satisfied where the "allegedly false statements were made to Plaintiff and other employees, not to the general public").

Thus, Davis-Frost has demonstrated several bases for the Court to grant summary judgment in its favor on FCA's ICFA claim (Count V).

## V. FCA DID NOT REASONABLY MITIGATE ITS DAMAGES

FCA claims that it reasonably mitigated its damages, but its argument is unsupported in the record. FCA is trying to change the narrative and divert attention from its attempts to secure its relationship with Mitsui at any cost and pass that cost on to FCA in this litigation.

The undisputed evidence demonstrates that FCA's top priorities was preserving its relationship with Mitsui. The record shows that FCA pitched a repair option that would repair the cars for a far lower cost than demanded by Mitsui. FCA's own expert, Dr. Iezzi, approved the repair plan and was optimistic about its success. (DF's SOF ¶ 25.) FCA presented this repair plan to Mitsui with the hopes that Mitsui would accept. (DF's SOF ¶ 25.) It was only Mitsui's negative response to the proposed repair plan that caused FCA to agree to fully strip the paint from the railcars and repaint them (and of course at the same time FCA and Mitsui agreed to share any net proceeds recovered from Davis-Frost in litigation). If FCA had reasonably mitigated its damages, it should have instructed Mitsui that the only available remedy was Davis-Frost's Warranty (that FCA passed through to Mitsui) with its $5,000 per car limitation as was agreed to in the master contract between FCA and Mitsui. (Maier 5/11/22 Dec. [Doc. 60-1] Ex. EE Section 9 ("With respect to parts and materials manufactured by others and incorporated by [FCA] in the Cars, such parts and material shall be covered only by the warranty, if any, of the manufacturer thereof . . .")) The fact that FCA agreed to Mitsui's desired repair option—costing significantly more money—

48874244v5

to avoid the threat of a lawsuit does not relieve FCA of its obligation to mitigate its damages. As a matter of law, the Court may find FCA did not act reasonably by simply agreeing to Mitsui's repair requirement in order to save its reputation and relationship with Mitsui

For this separate and independent basis, FCA's damages based on any theory asserted should be limited to $1,159,611—the amount FCA determined would be the cost of repairing the railcars. (DF's SOF ¶ 25.)

## CONCLUSION

For the reasons stated herein, and stated in its opening submission, Davis-Frost respectfully requests the Court grant summary judgment in its favor and against FCA and for such further relief this Court deems just and proper.

Respectfully submitted,

Dated: May 18, 2022

**LATHROP GPM LLP**

By: s/ Charles K. Maier
Justin L. Sallis (VSB No. 82599)
Charles K. Maier (PHV – MN Atty. #230315)
Kristin Stock (PHV – MN Atty. #0400820)
LATHROP GPM LLP
The Watergate – Suite 700
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
Phone: (202) 295-2200
Fax: (202) 295-2250
justin.sallis@lathropgpm.com
charles.maier@lathropgpm.com
kristin.stock@lathropgpm.com

**ATTORNEYS FOR DEFENDANT DAVIS-FROST, INC.**

## CERTIFICATE OF SERVICE

I, Charles K. Maier, hereby certify that on May 18, 2022, I electronically filed the foregoing Reply Memorandum of Law in Support of Motion for Summary Judgement with the Clerk of the Court using the CM/ECF system which sends notification of this filing to all counsel of record.


Dated:  May 18, 2022                              *s/Charles K. Maier*
                                                  Charles K. Maier, Attorney for Defendant